## TENNESSEE CENTRAL RAILWAY COMPANY v. FATE WILLIAMS.

Middle Section.    February 8, 1929.

Petition for Certiorari denied by Supreme Court, April 13, 1929.

530

Louis Chambers and Lillard Thompson, of Lebanon, and Walter Stokes, of Nashville, for plaintiff in error.

Walter S. Faulkner and F. P. McMillan, of Lebanon, for defendant in error.

FAW, P. J. This case was tried twice in the circuit court of Wilson county. On the first trial the jury returned a verdict for the plaintiff below, Fate Williams, and assessed his damages at $5000. This verdict was, on motion for a new trial, set aside by the trial judge on the ground that the evidence preponderated against the verdict, and a new trial was granted. On the second trial, the jury again found the issues in favor of plaintiff Williams and fixed his damages at $3000. The trial judge overruled a motion for a new trial by defendant Railway Company and pronounced judgment on the verdict for $3000 and costs, whereupon the Railway Company appealed in error to this court and has assigned errors here.

Although the Railway Company is plaintiff in error, we will, for convenience, refer to Fate Williams as plaintiff and to the Railway Company as defendant.

The plaintiff was injured on January 4, 1927, while working, as an employee of defendant, at a rock quarry operated by defendant adjacent to defendant's railway track about three and one-half miles east of Watertown in Wilson county. Plaintiff instituted this action on March 16, 1927, and thereafter filed his declaration, in one count, which was later amended by the insertion of additional averments at designated places therein.

Omitting formal introductory statement and averments of the corporate character and business of defendant, the declaration (including the amendments) is as follows:

"Whereas, heretofore, on the —— day of —— 1927, the defendant . . . while engaged in taking rock from a quarry some distance removed from its main track, having engaged the plaintiff, by contract, to assist in said operation, and while removing the rock for its purpose by means of conveying it along a line of improvised tracks over which cars containing the rocks were pushed, it being the duty of the servants so employed to push said cars, and the plaintiff being so engaged by the defendant, and being so directed, while pursuing the directions of said defendant Company, because of the negligent construction of said track (and) because of the condition of repair to which it had been allowed to become by the negligence of defendant, it having been allowed to sag suddenly in certain divers and many places along its line and to become so insecure and loose as to spread at certain points and to contract and catch and hold and bind the flange

of the car wheels at other points, so that when the heavy car would meet the sags in the track it would jostle and give a sudden jump and then run backward with force and violence, to suddenly catch and lock the wheels of the car on the track, and when, on the day aforesaid, while the plaintiff was engaged in pushing one of said cars at its rear, the car suddenly running into one of the sags on the neglected track, and running into one of the contracted points of the track, the track suddenly binding the flange of the wheels and suddenly stopped the car, the car violently gave a jerk, loosening the grasp of the plaintiff and causing him to fall upon the hard surface of the ties and ballast and rails of said track, resulting in serious and permanent injury to his body, especially to his back, causing him to suffer great pain and mental anguish and the expense of doctor's bills and the loss of time.

"The injury so received by the plaintiff was directly due to the negligence of the defendant in placing plaintiff and his fellow-workers in a position that was rendered quite perilous, because the defendant, through its carelessness and neglect, had allowed the track over which the car was to be pushed to become warped and unsteady, and to sag, and to contract and expand, binding the flanges of the wheels, making the course of the pushed car unsteady, and causing it, at the point of the accident, to jump from under the plaintiff and thus throw him on the hard surface beneath, to his injury aforesaid, for which he sues and asks for a jury to try his cause."

A brief prefatory statement of certain facts disclosed by the evidence will conduce to a better understanding of the questions presented by defendant's assignments of error.

Plaintiff was employed as a "loader" at defendant's rock quarry. The rock was quarried from the face of a bluff near the railroad track. A crusher was located immediately alongside the main track of the defendant. The rock was blasted out of the bluff and then broken up with sledge hammers. When thus reduced, it was loaded on tram cars and conveyed to the crusher. Two steel tram cars, of the latest improved type, each weighing approximately eighteen hundred pounds when empty, were used for this purpose. Each of these cars had a carrying capacity of about one ton of rock. The wheels of these cars were constructed after the pattern of an ordinary railroad car wheel, with a face about two and one-half inches in width, and flanges on the inside to hold the car on the track. The gauge of the track allowed about one-fourth of an inch of "play" for the flanges. The track was made of 25-pound steel rails (lighter than the rails ordinarily used on steam railroads) laid on standard cross ties.

Defendant had been operating this quarry for more than a year at the time plaintiff was injured, and the track had been extended from time to time farther from the crusher as the rock was removed from the quarry, and the track was somewhere from three hundred to four hundred and fifty feet in length—the estimates of the witnesses varying on this subject. For a distance of approximately one-half the length of the track, beginning at the crusher, the track was fairly well ballasted with stone, but the remainder of the track had very little ballast between the ties and, according to plaintiff's proof, the distance between ties varied from one and one-half to eight feet, and the ties were "pillared up," or supported, by "sprawl rock." Near the quarry the track was frequently moved, and it was customary to remove the rails for a distance of about ninety feet from the face of the quarry before each blast, or "shot" to avoid injury to the rails.

A "crew" of eighteen or twenty men were employed by defendant as laborers at the quarry, and five of these men worked as "loaders." The cars when loaded, rolled by the force of gravity down a slight grade (one and one-half percent) from the quarry to the crusher where they were unloaded by machinery. Two of the loaders rode on each car as it rolled down to the crusher and, after it was unloaded, they pushed it back to the quarry—walking behind the car on the ties and rails with their hands against the body or on the top of the car, which was about four and one-half feet above the surface of the track.

It was not a part of the work of the loaders to build, move or repair the track. This was done by other employees. However, all of the laborers at the quarry was under the direct supervision of the same foreman employed by defendant.

About the middle of the afternoon of January 4, 1927, while plaintiff and another loader (P. G. Grandstaff) were pushing an empty tram car from the crusher to the quarry in the manner before described, plaintiff fell on the track and, as a result of said fall, suffered personal injuries which, according to the testimony of plaintiff and his witnesses, were of a serious and painful nature and permanently impaired his earning capacity. The plaintiff's contention as to the cause of his fall and the resulting injuries to his person is stated in his declaration which we have already quoted.

At the close of all the evidence on the trial below, the defendant moved the court to peremptorily instruct the jury to return a verdict in its favor on grounds stated in the motion, as follows:

"1st. Because there is no evidence upon which to predicate any recovery for any amount in favor of the plaintiff.

"2nd. Because the undisputed and uncontradicted evidence establishes the fact that the condition of the tram track at the time of the accident and at the point of the accident, was so apparent that it was seen by the plaintiff, or could have been seen

by him by the exercise of reasonable care and attention, and the track was of such a simple construction that it did not require any skill or unusual knowledge to see and appreciate any danger that might by any possibility have existed in pushing the tram car thereon.

"3rd. Because the accident and alleged resulting injury of the plaintiff was not the natural and probable consequence of the condition of the tram track, but was an unforeseen occurrence or misadventure on the part of the plaintiff, for which the defendant, is not liable as a matter of law.

"4th. Because under the proof in this case considered in its most favorable light or aspect, in behalf of the plaintiff, he assumed the risk of pushing the tram car on the track, at the time of the accident, and is not entitled to any recovery against defendant."

It is insisted for defendant that there is no evidence upon which the jury could base a finding that the tram car was caused to stop by a defect in the track; that whether plaintiff was caused to fall by the sudden stopping of the car or the car stopped because plaintiff fell is a matter of conjecture and surmise. If this is the true state of the record, the defendant was entitled to a directed verdict. Buckeye Cotton Oil Co. v. Campagna, 146 Tenn., 389, 396, 242 S. W. 646; Chicago v. M. & St. P. R. Co., 271 U. S. 472, 70 L. Ed. 1041, 1045.

It is quite clear from the undisputed proof that the rails were not so far out of alignment as to bind the flanges on the wheels of the car to an extent that would necessarily stop the car when pushed up the grade by two men, for it appears that immediately after plaintiff fell, he and Grandstaff pushed the car on up to the quarry, and during the remainder of the afternoon two of the loaders continued to push the same car from the crusher back to the quarry over the same track and, so far as appears, they experienced no difficulty in pushing it over the "sag" where it stopped when plaintiff fell.

But there is evidence from which the jury could find that there was a sag in the track, especially in one rail at the point in question, and that by reason of the car inclining toward the lower rail the flanges of the wheels on that side would bind the rail to an extent that would retard the movement of the car, and thus make it necessary to apply more power at that point than if there had been no sag in the track. In this situation, whether the car would stop when it reached this sag depended, of course, on its momentum and the degree of power that the pushers were applying to it.

There is evidence which reasonably tends to show that the "sudden stop" of the car when it reached the aforementioned sag in the track caused the plaintiff to fall. In response to a question as to how the accident happened, the plaintiff said:

"I was employed pushing this car back to the quarry and Mr. Grandstaff with me, and rolling this car back to the quarry. We got it started and was rolling it along. We couldn't go very fast, and this car come to a sudden stop. These flanges locked between these rails. When it did that it threw my feet from under me and I fell with all my might down on the ground, on these rails and ties, and when I got up I seen I was hurt. I was hurt in my back."

On cross-examination, plaintiff said: "The car made a sudden stop and it threw my feet out from under me;" and we quote from plaintiff's re-examination the following:

"Q. I will get you to state whether this car at the time it did stop stopped slowly and easily or did it stop suddenly with a jerk? A. It stopped suddenly. . . .

"Q. What caused your feet to fly out from under you and you to fall? A. Stopped this car that I was pushing, stopped the car and my feet flew out from under me."

So far as the record shows, the only person who saw the plaintiff fall was P. G. Grandstaff, who was plaintiff's co-laborer in pushing the car up the grade, and he testified as a witness for plaintiff. Grandstaff's testimony relating to the manner in which plaintiff fell was as follows:

"Q. Now, I want you to state to his Honor and the jury how you and your companion here managed to push the car up at the place where it was elevated off the ground and where there was no ballast between the ties and where the ties were from two to six feet apart? A. Where there was a tie put your foot on the tie and then this foot on the rail and then reach over and get the next tie.

"Q. Did your foreman see that that was the way you had to do? A. Yes, nothing to keep him from seeing it.

"Q. Was it done there, and have you? A. Yes, sir.

"Q. Was there any other way to do it save this? A. No, sir.

"Q. Was that car easy or heavy and hard to push? A. It was tolerable heavy.

"Q. Mr. Grandstaff, can you tell his Honor and the jury what caused Fate to fall? A. Yes, sir.

"Defendant excepts.

"Q. Tell it to them, please sir.

"BY THE COURT: He can describe the condition and the jury will determine the conclusion.

"BY MR. FAULKNER: Q. Describe the condition. A. When he made a step on this tie and rail he reached over to get that rail. This foot (indicating) slipped off the rail. That gave him a trip and he went to catch the other tie with his foot and he

missed that and he kept falling until he got down on the ties, on his stomach, I throwed my weight against the car to hold it to keep it from coming back against him. He got up and he says, I hurt my back. . . .

"Q. Mr. Grandstaff, did you know what made the car that you all were pushing at the time Fate got hurt suddenly stop? A. It struck that place where the sprawl was out.

"BY MR. THOMPSON: That is the question that is being tried, let him state it did stop, how it stopped, the condition of the car, the condition of the track and the other inferences are to be drawn by the jury.

"BY THE COURT: I think he is asking him to describe what occurred just before.

"Defendant excepted.

"BY MR. FAULKNER: Q. Just go ahead and answer the question like General Thompson said.

"BY MR. THOMPSON: I am not interrogating the witness.

"BY THE COURT: Let the witness state how it occurred.

"BY MR. FAULKNER: Q. State if it did stop and how it stopped. A. We was going along with it all right and Fate's foot slipped and when it slipped that checked the car. We couldn't hardly push it and as soon as Fate's foot slipped the car stopped suddenly then.

"Q. Did you examine to see as to whether, with respect to the narrowness of that rail and the flanges of the wheel that car ran into and caught? A. Right there one sprawl was out and let the car tilt just a little and brought the flanges against the rail and that helped check it, you know.

"Q. Did you feel it or see it suddenly stop? A. No, but the place was there and we noticed it as we come down with the car.

"Q. In other words, to get along, these rails are laid along, sought to be parallel, and here is your car and the wheels of the car have flanges on the inside that run with them? A. Yes, sir.

"Q. And if the rails come a little close they run against that and that stops it suddenly, does it not? A. Yes, sir.

"Q. Was or not that the condition at that place? A. There was a place in the track—I don't know whether it was right there but there was a tight place in the track somewhere from the crusher down to the quarry.

"Q. I am talking about where he got that hurt? A. Not right there, I think that is where the sprawl was out.

"Q. What is a sprawl? A. Just a little, small rock.

"Q. Well, in other words, did that condition, the sprawl being out, so alter the rail as to cause that suddenly to stop? A. Well, I would suppose it had something to do with it, you know.

536

"BY MR. CHAMBERS: We except to what the witness supposes.

"Exception sustained.

"BY THE COURT: Q. Tell if that condition checked the car, as far as you know? A. It checked the car enough to throw his foot out from under him.

"BY MR. FAULKNER: Q. And he was pushing hard and it stopped suddenly and threw his feet out from under him? A. His foot slipped off the rail.

"Q. Did you receive a jerk at that time or not? A. I throwed my weight against the car and held it to keep it from coming back on him.

"Q. I will get you to state if that had been—you know the place and you know the rail and the car and all that, did you know if that had been even—if that had been perfectly parallel, the two rails had been perfectly horizontal, each one the same height, would that have had that effect.

"BY MR. CHAMBERS: We except to that.

"BY THE COURT: I regard this as quite material, I don't think you gentlemen would except if you notice the trend of the witness. The court is endeavoring to find out the condition, and the jury—

"BY MR. THOMPSON: It is speculation as to what it would have done if it had been parallel.

"BY THE COURT: I overrule the exception.

"Defendant Excepted.

"BY MR. FAULKNER: Q. Would it have affected the car and made it stop?

"BY THE COURT: I sustain the exception as to what would have been done. What was actually there; describe the conditions.

"BY MR. FAULKNER: Q. What was there that caused this car to suddenly stop? A. His foot slipped off the rail. That stopped us pushing.

"Q. What caused his foot to slip? A. Making his step from this tie, putting his foot on that rail and trying to catch the other tie.

"Q. Was there anything in the rail (that is the lawsuit) or the tie or the manner in which the rail was put there that caused the car to suddenly stop and caused it to throw his foot off the rail? A. Not that I know of.

"Q. You don't know? A. No, if there was anything that checked the car and made him fall, I don't know it.

"Q. What then made his foot slip? A. He stepped on the rail there.

"Q. I know, but he had been stepping on the rail from the crusher on up. What was there in the motion of the car then, or the want of motion of the car, that threw his foot off the rail? A. If he was pushing and had his weight—

"BY MR. THOMPSON: He has answered that repeatedly.

"BY THE COURT: I am trying to understand the witness and I think he should be permitted to answer. I regard his answer somewhat important. I take it you gentlemen aren't seriously excepting.

"BY MR. CHAMBERS: We are excepting to the repetition.

"BY THE COURT: I overrule it; I want to know the facts.

"Defendant Excepted.

"BY MR. FAULKNER: Q. You testified here before in this case, didn't you? A. Yes, sir.

"Q. You swore on the stand here before? A. Yes, sir.

"Q. Were you with Fate Williams at the time his foot slipped? A. Yes, sir.

"Q. I will get you to tell if you remember then what you said you saw that caused his foot to slip? A. I told you his foot slipped. We was pushing the car and had our weight against the car and he tried to get the other tie and his foot slipped off the rail.

"Q. Do you know what caused his foot to slip? A. Not unless that car struck in that place where the sprawl was out, and let the car slow down against the two rails and checked the car from going. If that wasn't it I don't know what it could have been.

"Q. Now was that it? A. That is it, I reckon.

"BY MR. CHAMBERS: We except to that.

"BY THE COURT: I take it that is the way the witness has of expressing himself.

"Defendant excepted.

"BY MR. FAULKNER: Q. Do you know that the car did suddenly stop? A. Yes, sir.

"Q. Then do you know as it suddenly stopped whether or not Fate's feet slipped out from under him? A. Yes, sir.

"Q. Now, I want to ask you this, don't answer until his Honor, the court, determine whether you should answer or not. What caused Fate's feet to slip from under him?

"BY MR. CHAMBERS: We except to that. It has been repeatedly asked and the witness has given his version of it.

"Exception sustained.

"BY MR. FAULKNER: Q. Now, I will get you to state as to whether this track, in the way it was set, was or not it set in

such a position as that it pinched or squeezed the wheels by the flanges of the car?

"BY MR. CHAMBERS: We except to that. Let him state the condition of the track.

"Exception overruled and defendant excepted.

"BY MR. FAULKNER: Q. I will get you to state the condition of the track in that regard? A. That is the only place that I know of where the track was that, right where he got hurt.

"BY MR. CHAMBERS: We except to this—

"BY MR. FAULKNER: Let the witness finish his answer—

"BY THE COURT: Gentlemen, be guarded and considerate and the court will rule on your exceptions.

"A. Right where he got hurt, that is where that slowed down and one side held the flanges of the car, rubbed the rail, and that checked the car.

"BY MR. FAULKNER: Q. Do you or not know that the flanges of the car at that particular point rubbed the rail? A. No.

"Q. Was it in a position where they would rub the rail?

"Objected to by defendant and sustained.

"Q. Describe it with respect as to whether it was in position for the flanges of the wheel to rub the rail at that place. A. Yes, it could have done it. It slowed down, you know, caught the rail and rubbed there and checked the car from going on.

"Q. Would that have had the effect of letting the car go on or stop it? A. Checked it up like the brakes on a wagon."

It is seen that Grandstaff testified, in effect, that the stopping of the car and plaintiff's fall were practically simultaneous; that the car stopped at the point on the track where "one sprawl was out and let the car tilt just a little and brought the flanges against the rail and that helped check it"—"checked it up like the brakes on a wagon," and that, in response to a question by the court as to whether "that condition checked the car," Grandstaff stated that "it checked the car enough to throw his foot out from under him." The foregoing testimony of Grandstaff tends to support plaintiff's statement that the sudden stopping of the car caused his foot to slip off the rail, but, under the circumstances, Grandstaff was not in a position to know as well as plaintiff what caused the latter to fall.

It is not within our province, in a jury case, to weigh conflicting evidence. We are of the opinion that the testimony of the plaintiff, supported, to the extent before stated, by the testimony of Grandstaff, afforded a basis for a finding that plaintiff's fall was caused by the sudden stopping, or checking, of the movement of the car, which, in turn, was caused by the "sag" in the track.

But, notwithstanding our conclusion just stated, the defendant's motion for a directed verdict should have been sustained if, upon the undisputed evidence, with all reasonable inferences to be drawn therefrom, it is clear, as a matter of law, that, as averred in defendant's motion for peremptory instructions, plaintiff ''assumed the risk of pushing the tram car on the track at the time of the accident.''

Plaintiff was about thirty-nine years of age at the time he suffered the injuries for which he is seeking a recovery in this case. Although an uneducated man, plaintiff's testimony shows that he is a man of good native intellect. He had been working regularly as a loader at defendant's quarry for more than eight months at the time he was injured. He was necessarily familiar with every removal, replacement and readjustment of the track that had occurred during the period of his employment, for he rode from the quarry to the crusher on a loaded car and pushed the unloaded car back to the quarry repeatedly every working day. The opportunities of the ''loaders,'' including the plaintiff, to observe the condition of the track were apparently superior—certainly equal—to those of defendant's foreman, or any other employee or agent of defendant. Plaintiff continued in his employment at defendant's quarry with full knowledge of the conditions, and without complaint or suggestion of defects in the track. The imperfections and defects in the track were not latent or hidden, but patent and obvious. Grandstaff's testimony shows that he had previously observed the particular ''sag'' in the rail of which plaintiff is complaining in this case.

In the case of Railroad v. Handman, 13 Lea 423, 425, 430, (decided before the practice of directing verdicts was adopted in Tennessee), the Supreme Court, speaking through Judge Cooper, said:

''In this State we have adopted the general rule, established by the authorities, regulating the relative rights of master and servant. The servant on entering into service knows, or is taken to know, that there are extraordinary dangers inseparable from such service, which human care and foresight cannot always guard against. If he voluntarily engages to serve in view of all the hazards to which he will be exposed, it is well settled that, as between himself and his employer, he undertakes to run all the ordinary risks of the service. . . . In ordinary cases the jury should be told that to authorize a recovery these two things must concur: knowledge on the part of the master or its equivalent negligent ignorance and a want of knowledge on the part of the servant or its equivalent excusable ignorance. If the knowledge or ignorance of the master and servant in respect to the character of the machine are equal, so that both are either without fault or in equal fault, the servant cannot recover.''

The foregoing statement of the law in Railroad v. Handman was approved in the case of Railroad v. Edwards, 111 Tenn., 31, 53, 76 S. W. 897.

Frequent statements of the same principle, in different phraseology, are found in our cases, some of which we quote below.

"When a servant enters upon an employment necessarily hazardous, he accepts the risks necessarily incident to such service, and if with knowledge of the facts, he accepts employment on machinery defective from its construction, or for the want of proper repair, he cannot recover damages for any injury within the scope of the danger which both the contracting parties contemplated as incident to the employment." Railroad v. Hodges, 1 Shan. Cas. 434, 437 (approved in Railroad v. Edwards, supra.)

"If the plaintiff in this case was aware of the danger attending his work, or it was so obvious and apparent that a man of ordinary intelligence would have seen it, then he must be held to have taken its risks and hazards, and would not be entitled to recover." Brown v. Electric Railway Co., 101 Tenn., 252, 255, 47 S. W. 415, citing Bailey's Personal Injuries, sections 501, 502a, 796, 796a.

"The rule is that if the danger is obvious, and the servant has sufficient discretion and opportunity to see and avoid it, the master cannot be held for any injury to the servant, although he did not warn him of the danger." Ferguson v. Phoenix Cotton Mill, 106 Tenn., 236, 239, 61 S. W. 53, citing Woods' Law of Master and Servant, sec. 349.

"The rule is that the servant assumes all risks which are necessarily incident to his employment, or which are obvious or known to him." Baird-Ward Printing Co. v. Fleming, 137 Tenn., 349, 354, 193 S. W. 115.

When the master and servant are equally competent to judge of the risks and hazards, there is no ground of recovery. Trotter v. Furniture Co., 101 Tenn., 257, 260, 47 S. W. 425.

Other Tennessee cases announcing and applying the same doctrine are as follows: Knitting Mills v. Hickman, 133 Tenn., 43, 46, 179 S. W. 385; Grasselli Chemical Co. v. Bettis, 5 Hig., 103, 111, 113; Wind Rock Coal & Coke Co. v. Robbins, 1 Tenn. App. R. 734, 747; Brewer v. Tennessee Coal Etc. Co., 97 Tenn., 615, 619, 37 S. W., 549; Moore v. Railway Co., 119 Tenn., 710, 718, 109 S. W., 497; Railroad v. Smith, 9 Lea 685, 688; Gann v. Railroad, 101 Tenn., 380, 386, 47 S. W., 493; Acme Box Co. v. Gregory, 119 Tenn., 537, 541, 105 S. W. 350; Corbett v. Smith, 101 Tenn., 368, 373, 47 S. W., 694; Tennessee Central Railway Co. v. McBride, Court of Appeals, Middle Section, opinion by Judge DeWitt, January 28, 1928, and certiorari denied by Supreme Court May 26, 1928.

"It is generally agreed that assumption of risk may be a defense in cases where there is no contributory negligence, and where more than ordinary care has been exercised by the employee." 18 R. C. L., p. 674, par. 165.

The servant may assume the risk of the negligence of the master. Brick Co. v. Dotson, 8 Hig. 218, 222.

We are of the opinion that, upon the undisputed facts of the record, plaintiff assumed the risk of injury from defects in the track such as that of which he complains in this case, and that the defendant's motion for a directed verdict should have been sustained. Through its motion for a new trial below, defendant sought to have the trial judge review and reverse his ruling on defendant's motion for peremptory instructions and to enter judgment accordingly, and in this court defendant's second assignment of error is based upon the action of the trial court in overruling defendant's motion for a directed verdict and in overruling the ground of defendant's motion for a new trial relating to the motion for a directed verdict. For the reasons we have stated, the defendant's second assignment of error is sustained.

The defendant's first assignment of error is that "there was no material evidence to support the verdict of the jury and the judgment of the court pronounced thereon."

If, as we have held, upon the application of the doctrine of assumption of risk to the undisputed facts of this case, plaintiff is not entitled to maintain his action, it follows, as a matter of course, that the first assignment of error must be and it is, sustained.

The third assignment of error is based on the refusal of the trial judge to give in charge to the jury defendant's special request No. 3, which embraced an instruction applying the doctrine of assumption of risk to the facts of the case. In view of our ruling on the second assignment of error, consideration of the third assignment is unnecessary and will be pretermitted.

The fourth assignment is that the court erred in refusing to give defendant's special request No. 8 to the jury. Request No. 8 embodies a correct statement of law, but the court did not err in refusing to give it to the jury, for the reason that, in four separate places in his charge, the court gave the jury correct and sufficient instructions on the subject embraced in request No. 8. There was, therefore, no error in the court's refusal of request No. 8, and the fourth assignment of error is overruled.

There are six additional assignments of error, numbered 5 to 10, inclusive. The fifth, seventh, eighth and ninth assignments relate to the admission of evidence over the objection of the defendant. The sixth assignment relates to the exclusion from the jury of evidence offered by the defendant. Through its tenth assignment defendant

542

asserts that the trial court incorrectly stated the insistence or theory of the plaintiff in his charge to the jury. We have carefully considered all of the last mentioned assignments (numbered 5 to 10, inclusive), and we find no reversible error in the rulings of the trial court thereby challenged, and said assignments are all overruled.

In view of our holding that the defendant's motion for a directed verdict should have been sustained, we deem it unnecessary to extend this opinion by a further discussion herein of the last six assignments of error. However, we have stated our rulings upon all of the assignments of error in order that defendant may be in a position to obtain a review thereof, in the event the Supreme Court should, on petition for certiorari, disagree with our view that the defendant's motion for a directed verdict should have been sustained.

It results from our action in sustaining the defendant's second assignment of error that the judgment of the circuit court is reversed, the verdict of the jury is set aside, and the plaintiff's suit is dismissed. The costs of the cause accrued in the circuit court and the costs of the appeal will be adjudged against the plaintiff Fate Williams.