# WILSON v. NASHVILLE, C. & ST. L. RY.

Middle Section.   August 5, 1933.

Petition for Certiorari denied by Supreme Court, December 15, 1933.

Eugene McSweeney and J. B. Daniel, both of Nashville, for plaintiff in error.

Seth M. Walker, of Nashville, for defendant in error.

FAW, P. J. This is an action brought by the administratrix of the estate of Harry L. Wilson, deceased, to recover $50,000 as damages for the alleged wrongful death of her intestate.

At the close of the plaintiff's evidence in chief, the trial court sustained a motion of the defendant for a directed verdict and dismissed the case, whereupon the plaintiff administratrix, after her motion for a new trial was overruled, appealed in error to this court, and is here complaining of the action of the trial court in directing a verdict for the defendant, and in excluding, on motion of defendant, certain testimony previously introduced on behalf of plaintiff.

About 1:50 o'clock A. M. on April 22, 1929, plaintiff's intestate, Harry L. Wilson, fell from the rear platform of the rear car attached to one of defendant's passenger trains, at Wauhatchie, Tennessee, a station about six miles from Chattanooga on defendant's railroad line between Chattanooga and Nashville, and, as a consequence thereof, died at a hospital in Chattanooga about four o'clock in the afternoon of the following day, April 23, 1929.

The deceased left surviving him, as his next of kin, a widow, and a daughter fifteen years of age. The widow, Mrs. Katie C. Wilson, qualified as administratrix of the estate of her deceased husband, and, as such administratrix, brought this suit on April 19, 1930.

Plaintiff's intestate was fifty-four years of age at the time of the death, and he had been employed as a Pullman conductor for about twenty years. He lived in Nashville and his "run" was "from Nashville to Atlanta, and then from Atlanta back to Nashville," and he had been on that "run" about sixteen or seventeen years.

Plaintiff's declaration contains two counts—first a common-law count, and 'a second count manifestly designed as an action predicated on the Federal Employers' Liability Act (45 U. S. C. A., sections 51-59).

After averments of the representative character of plaintiff as administratrix, etc., and of the corporate character and business of the defendant, the first count of the declaration is as follows:

"At the time of the injuries hereinafter complained of, to-wit, on the 22nd day of April, 1929, plaintiff's intestate, Harry L. Wilson, was employed as a Pullman conductor on a train of defendant that had just left Chattanooga on its way to Nashville and other points on its line.

"There were several Pullman cars in said train and attached to them as the hindmost car in the train was a private car. Said private car had safety gates and a trap-door on its rear platform, as the rear coach of the train, which when open, and the safety gates folded back, was an extra hazardous and dangerous deadfall while the train was running at night.

"Plaintiff further avers that by the negligence of defendant and its officers, employees and agents, when this train left Chattanooga about one o'clock at night, this trapdoor was open and the safety gates were folded back, thus leaving a death trap at night at the rear of this train, which was liable to injure or kill any one who should go to the end of the train.

"Plaintiff's intestate as such Pullman conductor was upon said train by authority and invitation of the defendant and was liable to go to the rear of the train in the discharge of his duties at any time, and he had a right to presume that the rear of the train was reasonably safe and the safety gates were up and the trap-door was closed; and he was ignorant of the fact that the rear of the train was left as a death-trap.

"One of the duties which caused him to go to the rear of said train was to protect it from tramps, bums, hoboes and trespassers who were likely to occupy it stealing a ride, and particularly in such a large city as Chattanooga at night.

"Plaintiff further avers that soon after the train left Chattanooga, plaintiff's intestate, the Pullman conductor on said train, while in the exercise of ordinary care in the discharge of his duty, went upon the rear platform of said train, and by reason of the said negligence of defendant, he was hurled and thrown through said open trap-door

and hole in the floor, to the ground beneath while the train was running at full speed; whereby and on account of which he was so crushed, broken and mangled, that he died from said injuries after lingering in great pain and agony until the afternoon of the next day.

"Deceased left surviving him as his next of kin, the plaintiff, his widow, and Sue Guthrie Wilson, his child, fifteen years of age.

"Defendant, though liable, refused to pay, hence suit."

The second count contains substantially all of the averments of the first count, and, in addition thereto, it contains averments as follows:

"Plaintiff further avers that it was the custom of the defendant to require plaintiff's intestate to go to the end of the train to see that it was clear of tramps, bums, hoboes and trespassers stealing a ride, and that all persons thereon had paid their fares, and to take up the railroad tickets of all passengers in the Pullman cars and all rear cars.

"This train was an interstate train engaged in interstate commerce, and, at the time of the injuries, plaintiff's intestate went to the rear of the train in the execution of his duty and custom to collect railroad tickets and fares and to see that it was clear of tramps, bums, hoboes and trespassers, and that all persons thereon had paid fares.

. . .

"The defendant was a common carrier by railroad. In doing said work in which he lost his life. Plaintiff's intestate was upon the defendant's train by its invitation and authority and was performing a duty and doing the work of the defendant as an employee and servant. By virtue of his position as Pullman conductor he was subordinate to the train conductor, an employee of defendant, and said work was left for him to do by implied invitation of said conductor and the defendant.

"In the performance of this particular job plaintiff's intestate was doing the work of the defendant, and this act of collecting railroad tickets and fares and policing the train and clearing the rear of the train of tramps, bums, hoboes and trespassers was an essential duty to the defendant railroad, and this important work for the defendant was so closely related to interstate commerce as to practically be a part of it, and for the time being plaintiff's intestate occupied the relation of employee of the defendant railroad and was engaged as such in interstate commerce transportation, and when killed was doing work as an employee of the defendant on an interstate train engaged in interstate commerce carrying passengers.

"At the time of his death plaintiff's intestate was fifty-four years of age, with a strong constitution and perfect health. And the value of the expectancy of the support and financial contributions and as-

sistance to plaintiff, his said wife and child by the deceased, of which they have been deprived by his death, was very great; while his said child has also been deprived of the care, counsel, training and education of her father."

So far as disclosed by the evidence introduced at the trial, only one person saw plaintiff's intestate fall from the train at the time he received the injuries which resulted in his death as aforesaid. The eyewitness just mentioned was C. V. Courson, a telegraph operator employed by the Alabama Great Southern Railroad Company at Wauhatchie. The substance of Courson's testimony will appear from excerpts from his testimony as follows:

"Q. Just go on, now, in your own way, and state how the accident occurred, and what happened? A. And what I did?

"Q. Yes, sir. A. Well, as this train passed, they had issued instructions for us to watch these trains as they passed along, to see if they had dragging brake beams, and such as that. So this train was passing, and I walked to the door on the second story of this office, turned on my light, and was watching the train, and as the rear end passed, this Mr. Wilson was standing on the rear end of the observation platform of a private car, facing me. He was working with his tickets some way, shuffling them and separating them, and all of a sudden he give a little quick jerk and pitched right out of the door of the rear end of this car, his head hitting about six inches —well, I will say a foot from the end of the cross-ties, and he tumbled and rolled about thirty feet down the railway tracks and over into the field, or down the embankment.

"Q. From the manner in which he fell would you say whether the trap door was up or down? A. As far as seeing the door, I couldn't see it at that time, because the railing around that observation platform would have kept me from seeing this trap-door.

"Q. You didn't catch my point. Describe the manner in which he fell? A. He just gave a little jerk and pitched right out backwards at the side-door, because of course there is no back entrance to it.

"Q. At the time you say that he had some papers in his hands, looking over them? A. Yes; I found them later.

"Q. From the time that you had first seen him, what was the interval between your seeing him and the fall? A. Well, I don't know.

"Q. Did he seem to fall as soon as you saw him? A. Well, I saw him fifteen or twenty seconds before he fell; he was on the platform, riding all right, working with these papers; I didn't see him step out the door; he was already on the outside of the door when I saw him.

"Q. That's what I say, he was standing on the outside of the door? A. Yes, sir.

"Q. And while standing there you saw him fall? A. Yes, sir.

"Q. Did he go down? A. Yes, sir.

"Q. Could he have gone down the way you saw him if the trap-door had been down and fastened? A. No, sir.

"Q. What did you immediately do, after you saw that? A. Well, I reported to the train dispatcher, and told him that some one fell off of that train and I was going down there to see about it.

"Q. Where was the train dispatcher? A. Chattanooga.

"Q. Did you report by telegraph? A. Telephone.

"Q. If at any time you called for an ambulance, was it before you went down there to see the man, or after you got down and saw the man? A. After I got down and saw him.

"Q. When you got down and saw the man, how far was he lying from the track on which the car was standing? A. His feet were about five feet from the outside track.

"Q. That is, outside of the track that the train was on? A. Yes, sir.

"Q. What condition did you find him in? A. Well, he was lying down with his feet head first, with his head right under him, both arms doubled right under him, and his right heel was lying kind of over on the back.

"Q. Did you test to see whether he was dead or living? Was he dead, or living, when you got there? A. No, sir, I couldn't tell right then, because I had another train coming and I had to run back across the track to fix him, and then when I started back to him, after this other train got by, I discovered that he was not dead; I heard him breathing before I got to him.

"Q. What was the interval between your leaving him and getting back to him, how much time? A. I would say four minutes.

"Q. Was he unconscious? A. Yes, sir.

"Q. But he was still living? A. Yes.

"Q. After you discovered that he was lying there and was still living, whom did you call? A. I went on back and told the dispatcher again what I had found out, and he wanted to send a switch-engine out there and get him, so I ran back to him, and when I got back to him the second time I found out that he wasn't dead, and ran back to the 'phone and told them to send an ambulance instead of a switch-engine.

"Q. Did they send an ambulance? A. Yes.

"Q. Did the train he fell from come back after he fell? A. Yes, sir.

"Q. How long was that? A. It took him about—it took him twelve minutes.

"Q. Did the ambulance come? A. Yes.

"Q. Which got back to where the man was first, the ambulance or the train? A. The train got back to him first.

"Q. How far first? A. Well, he got to me about four minutes before the ambulance did.

"Q. The ambulance got there in about four minutes, and the ambulance came in response to your call to Chattanooga? A. In response to the dispatcher's call; I did not call him.

"Q. Well, the call that you gave to the dispatcher? A. Yes, sir.

"Q. Did you examine the man enough to see how badly he was hurt? A. No, sir.

"Q. Was this train that you have been talking about from which he fell a train of the Nashville, Chattanooga & St. Louis Railway? A. Yes, sir.

"Q. Was the dispatcher that you talked to in Chattanooga and requested the ambulance, was he a dispatcher of the Nashville, Chattanooga & St. Louis Railway? A. Yes, sir.

"Q. What was the date of the accident? A. Well, I went to work at eleven o'clock at night on the 21st; it happened at 1:50 A. M., made it the 22nd.

"Q. Twenty-first and twenty-second of what? A. April.

"Q. When? A. 1929.

"Q. When you got to the place, did you find any tickets? A. Yes, sir.

"Q. Where were they? A. They were lying right where he hit the ground, up on the level ground, around at and between the ties.

"Q. Were they such tickets as he was holding in his hand at the time he fell off? A. Yes, sir.

"Q. Did you deliver those tickets? A. No, sir.

"Q. I say did you give those tickets to anybody? A. I didn't touch the tickets; the conductor got them.

"Q. The conductor of the N. & C. train? A. Yes, sir.

"Q. After this accident, did the claim agent of the Nashville, Chattanooga & St. Louis Railway come out and talk to you? A. Yes, sir.

"Q. Did you tell him what you knew about the accident? A. Yes, sir.

"Q. Did you give him your name, and everything? A. Yes, sir.

"Q. How long was that after the accident? A. I don't remember how long it was; it seems to me it was just a short time; I know I was working on a different shift when he came back out there to see me."

We quote further from the cross-examination of Courson as follows:

"Q. And at the point of this accident, the tracks of the A. G. S. Railroad parallel the Nashville, Chattanooga & St. Louis Railway? A. Yes, sir.

"Q. That is a branch I mean, that is a line of the Nashville, Chat-

tanooga & St. Louis Railway which runs from Chattanooga to Nashville, Tennessee? A. Yes, sir.

"Q. Which way did the tracks run of the N. C. & St. L. Railroad, at Wauhatchie, as you recall it, north and south? A. North and south; it touches the A. G. S., but in opposite directions.

"Q. Do the tracks of the A. G. S. cross the N. C. & St. L. Railway at Wauhatchie? A. No, sir.

"Q. They run on parallel with them for some distance, on towards Chattanooga? A. Yes, sir. . . .

"Q. What train was that from which Mr. Wilson fell? A. Number four.

"Q. That is a passenger train? A. Yes, sir.

"Q. Carries Pullmans? A. Yes, sir.

"Q. Now, on the rear end of this train was a private car? A. Yes, sir.

"Q. A Southern car, private car? A. I don't know whose private car.

"Q. Did you know it was a private car? A. I heard it was.

"Q. Well, you could look at it and tell of course, tell that it was a private car? A. I could look at it.

"Q. When the train backed up you saw it, and saw what it was? A. I didn't see it.

"Q. Oh! you just heard it was a private car? A. Yes, sir.

"Q. What time was this train due to arrive at Wauhatchie?—One-fifty, I believe, was the schedule? A. Yes, sir.

"Q. It was running on time, wasn't it? A. The best I remember, it passed there at 1:52.

"Q. How far is it from Wauhatchie to Chattanooga? It is six miles, isn't it? A. Six miles.

"Q. And you were standing on the platform of the tower? A. Yes, sir.

"Q. Just watching the train go by? A. Yes, sir.

"Q. It is a straight track, isn't it? A. Yes, sir.

"Q. For some distance north of the point where Mr. Wilson fell the track is straight for a mile or more, is it not? A. Hardly a mile I believe down there from the tower.

"Q. About three-quarters, right on a straight dead-line, is that true? A. Yes, sir.

"Q. And then out at the point of the accident it is on a dead straightaway, is it not? A. Yes, sir.

"Q. And then for some distance south towards Nashville, for a mile or so, it is on a straight dead level track? A. No, sir, not that far.

"Q. About how far? A. Just down to the crossing it is about four hundred yards.

"Q. About four hundred yards north and south at the point where this accident occurred the track was on a straightaway? A. Yes, sir.

"Q. Just as straight as it could be, is that not true? A. Yes, sir.

"Q. Now, about how fast was the train running? Forty miles an hour? A. He was making forty or fifty miles an hour.

"Q. That is the regular ordinary speed of the train as it comes through there, is it not? A. Yes, sir.

"Q. Nothing unusual about the speed of the train, or anything else? A. No, sir.

"Q. That you saw that night, is that right? A. That's right.

"Q. And when the train passed, as I understand you saw Mr. Wilson standing on the back platform? A. Yes, sir.

"Q. Of this car that you understand is a private car? A. Yes, sir.

"Q. And the train was just running along like it always did every night, is that right? A. That's right.

"Q. And right on the straightaway, there, is that right? A. Yes, sir.

"Q. And you saw him fumbling or fooling with something in his hand, did you? A. Yes, sir.

"Gen. Washington: He said papers.

"Mr. Walker:

"Q. Papers of some kind? A. Yes, sir.

"Q. Of course you did not know what they were at that time? A. No, sir.

"Q. You knew he was looking at some papers, or had some papers in his hand? A. When he fell?

"Q. I mean when he was on the platform there when you saw him? A. Yes, sir.

"Q. And then while he was standing there, all of a sudden you just saw him topple and fall? A. Yes, sir.

"Q. That is all you saw? A. Yes, sir.

"Q. The next thing you knew, why of course you saw him on the ground? A. Yes, sir. . . .

"Q. Now, did you see him while standing on the platform just reel and kind of fall, that way? A. No, sir, he just kind of squatted and fell, just give a little quick jerk.

"Q. Just gave a jerk and fell? A. Yes, sir, tumbled right down from the door.

"Q. The train was running straightaway at that time? A. Yes, sir.

"Q. You saw no jerking or lurching of the train—it was just running right along on the track like it always did? A. Yes, sir.

"Q. He was standing in the middle of the platform when you saw

him give that jerk and fall? A. Looked to be practically in the center of it, yes, sir.

"Q. He fell to the left, did he, as the train was moving towards Nashville? A. Yes, sir.

"Q. Now, on your direct examination you said something about falling out the back of the train; you don't mean that he fell out of the back part of the train, because he didn't do that? A. No, sir.

"Q. He fell to the left, as I understand you? A. Well, the way the train was moving he fell right backward of the way the train was moving on the right hand side of the track.

"Q. Then both of us were confused a minute ago when I understood you to say as the train was moving from Nashville to Chattanooga, that he fell off to the left? A. No, sir, the train was not moving from Nashville to Chattanooga, but from Chattanooga to Nashville. The train was going to Nashville.

"Q. I mean from Chattanooga to Nashville? A. Yes, sir.

"Q. As the train was moving from Chattanooga towards Nashville, he fell over and off of the right side, instead of the left side? A. Yes, sir.

"Q. How far was the train past the tower when you saw this man fall? A. Well, the rear end was just passing me, about nine coaches long, he was about ten or twelve feet past the tower, just kind of angling from me.

"Q. You think that the back end of the train was only ten or twelve feet from you when you saw him fall? A. Exactly, that was even with him, possibly the back end of the train was forty feet I guess from me.

"Q. Of course you couldn't see the man until after the train had passed by you, could you? A. Not until the rear end had passed me.

"Q. That is what I mean? A. Yes, sir.

"Q. And he just fell all at one time, did he, all at once? A. Yes, sir."

No objection was made to any part of the deposition of C. V. Courson at the time it was read to the jury; but after five other witnesses for plaintiff had testified, and counsel for plaintiff had announced that plaintiff had "closed her case in chief," the jury was excused at the request of counsel for defendant, who thereupon moved the court to exclude from the consideration of the jury a question and answer in the deposition of the witness Courson, "upon the ground that the question calls for a conclusion of the witness and also on the ground that the answer is a conclusion of the witness," which question and answer are as follows: "Q. Could he have gone down the way you saw him if the trap-door had been fastened? A. No, sir."

The trial judge sustained the objection, and plaintiff predicates her second, third, and fourth assignments of error upon this ruling.

The second assignment is that the court erred in excluding the aforesaid question and answer (which question and answer are copied into the assignment), "because the witness was an observer of the accident, a railroad employee whose duty it was to observe trains as they passed his signal tower and report them, and said testimony was competent testimony that the trap-door was not down and fastened, or tended to prove that fact, when taken in connection with his other testimony unobjected to."

The third assignment is that "the trial court erred in not granting a new trial on account of error in excluding the above question and answer at the time it was excluded, to-wit: while defendant was making its motion for peremptory instructions, after plaintiff had rested her case—because defendant had waived its right to make such objection by its failure to object when the question was asked or during the seven months the deposition was on file, or during the reading of said question and answer and deposition, or during the progress of the case, and by cross-examining the witness upon the subject; and the exclusion of said testimony after plaintiff closed her case and her witness had gone was a miscarriage of justice."

And the fourth assignment is that "the trial court erred in not granting a new trial because plaintiff was surprised at the action of defendant in moving to exclude said question and answer at the close of her proof, and for newly discovered evidence, offered with her motion for new trial, set out in the transcript, pp. 122-134."

It is seen that, through her second assignment, supra, plaintiff is insisting that the excluded question and answer were competent, and that for that reason it was error to exclude them.

It will be observed that a previous question in Courson's deposition was, in substance, practically the same as the excluded question; that is to say, Courson had been asked by plaintiff's counsel this question, viz.: "From the manner in which he fell would you say whether the trap-door was up or down?" The witness answered the question just quoted as follows: "As far as seeing the door, I couldn't see it at that time, because the railing around that observation platform would have kept me from seeing this trap-door."

The statement just made by the witness makes it clear that the excluded question called for an inference or conclusion of the witness, and that the answer was the statement of an inference or conclusion drawn by him from observed facts.

"It is the function of the witness to state evidentiary facts and the function of the jury to draw such conclusions as the facts warrant." Jones on Evidence (2 Ed.), volume 3, section 1243, page 2285.

The reasons for the rule just stated are set forth in section 1242 of the volume just cited, as follows:

"Reasons for Rule.—There is no more familiar statement in the law of evidence than that the opinions of witnesses are, in general, irrelevant. Omne sacramentum debet esse certae scientiae. Even when witnesses are limited in their statements to detailed facts, their bias, ignorance, and disregard of the truth are obstacles which too often hinder in the investigation of the truth. If it were a general rule of procedure that witnesses might be allowed to state not only those matters of fact about which they are supposed to have knowledge, but also the opinions they might entertain about the facts in issue, or the impression made upon them by, or conclusions or inferences to be drawn from, such facts, the administration of justice would become little less than a farce.

"Nevertheless the general rule rejecting opinions of witnesses is subject to very important exceptions. For example, the opinions of witnesses who possess peculiar skill or knowledge may be received when the facts are such that jurors, presumptively without such skill or knowledge, are likely to prove incapable of forming a correct judgment relative to the matter in hand without the aid of such opinions."

However, there are recognized exceptions to the general rule with respect to opinions of nonexpert witnesses. The opinions of nonexperts are admissible on questions of identity as applied to persons, things, animals, or handwriting; the size, color, and weight of objects; time and distance; the mental state or condition of another; insanity and intoxication; the affection of one for another; the physical condition of another as to health or sickness; values; and the soundness of animals, provided they state, as far as practicable, the facts on which their opinions are based. Id., p. 2300; Cumberland Telephone Co. v. Dooley, 110 Tenn., 104, 110, 72 S. W., 457; Holder v. State, 119 Tenn., 178, 210, 104 S. W., 225.

The reason for such exceptions is stated in section 1248 of Jones on Evidence, supra, as follows:

"Reasons for Exceptions.—As shown in the sections next preceding, the rule excluding testimony of nonexpert witnesses to their conclusions or opinions regarding the facts in issue is broad and of general application. Such rule, however, yields to necessity where its application would wholly prevent or seriously impair the ascertainment of truth.

"It often happens that it is practically impossible for a witness to detail all the pertinent facts of an occurrence in issue in such manner as to enable the jury to form a conclusion without the opinion of the witness. Indeed, the witness may not be able to separate the facts and indications from which he has formed a conclusion from the

conclusion itself. In many of the illustrations hereinafter set forth it is plain that, from the necessity of the case, the opinions of ordinary witnesses must be received. The ground upon which opinions are admitted in such cases is that, from the very nature of the subject in issue, it cannot be stated or described in such language as to enable persons not eyewitnesses to form an accurate judgment in regard to it. Of course in all such cases, if the witness is unable to give any satisfactory basis or reasons for his opinion, the value of his testimony is impaired. Furthermore, it is to be observed that the matters as to which ordinary witnesses are allowed to give their opinions are only those of such character that they may be understood without special skill or training.''

Section 1246 of the same volume is as follows:

''Principle in Doubtful Case.—It has been remarked that the general rule that facts and not conclusions should be stated is wise and salutary and cannot be too strictly followed. It tends to prevent fraud and perjury and is one of the strongest safeguards of personal liberty and private rights. Accordingly whenever it is doubtful whether a case falls under the rule or under one of its exceptions, the wise course is to place it under the rule. In' an important case it is said that to require the exclusion of opinions of nonexperts, 'it is not needed that the jurors should be able to see the facts as they appear to eye-witnesses or to be as capable to draw conclusions from them as some witnesses might be, but it is sufficient that the facts can be presented in such a manner that jurors of ordinary intelligence and experience in the affairs of life can appreciate them, can base intelligent judgments upon them and comprehend them sufficiently for the ordinary administration of justice.' Nevertheless the question is primarily one for the exercise of the sound discretion of the trial court. The exercise of such discretion may, of course, be reversed for abuse; but it is not lightly to be overturned in the absence of showing of prejudicial error.''

We think the excluded question and answer would have constituted an invasion of the province of the jury and were incompetent.

The third assignment of error, supra, is not well made. In Creed v. White, 11 Humph., 549, 552, the court said: ''We have held, and such is now the settled law of this court, that the party to be prejudiced by the admission of illegal testimony, not objected to when offered, may insist upon the exclusion of such evidence from the jury, at any time before their retirement from the bar, unless there has been an explicit waiver of the objection to the evidence.''

The rule thus announced in Creed v. White, supra, was reaffirmed in Moon v. State, 146 Tenn., 319, 368, 242 S. W., 39.

The third assignment of error is likewise unsupported by the

record, when tested by the applicable rules of law and practice. No complaint on the ground of "surprise" was made on behalf of plaintiff when the trial court excluded the aforementioned question and answer, and not until the motion for a new trial was filed several days after the judgment dismissing the case.

A party waives his right to complain on the ground of surprise, if he fails to take immediately all available steps, during the trial, to avert injurious consequences. Nellums v. Nashville, 106 Tenn., 222, 61 S. W., 88.

It is also clear that the record presents no sufficient reason for the grant of a new trial on the ground of newly-discovered evidence. The alleged newly-discovered evidence was, in substance, evidence that the car platform from which deceased fell had a railing around it about three feet high, with gates in the railing on each side of the platform, and an exit on each side of the platform in the form of steps covered by trapdoors, so that occupants of the car could get on or off the platform at the right or left side, and that the gate and trapdoor in the platform from which plaintiff's intestate fell was open, and it had been left open by an employee of defendant railway.

Plaintiff did not offer, on the hearing of the motion for a new trial, the testimony or affidavit of any witness by whom she could prove that said trapdoor was open at the time her intestate fell from the car. Plaintiff states, in her affidavit, that, from talking to employees of defendant, she "has elicited enough confidential information for her to state that she believes that she can show that the private car from which her husband fell had steps with trap-door and safety gate over same on the side of the platform from which he fell, and that these had been left open by an employee of the defendant railway, and that her husband fell through the hole or trap thus created."

Plaintiff says, however, that she did not undertake to procure this testimony (at the trial) because she was advised by her attorneys "that she had enough evidence to make out her case, and that the Railway Company then would put on its employees, and the full facts about this accident be brought out by the party in possession of the evidence and records."

The matters which plaintiff thus asserts that she believes she can prove on another trial were specifically alleged in plaintiff's declaration, and it was her duty to come prepared to prove them at the trial. She could not rely upon the assumption that the defendant's witnesses would make out her case for her. The rules governing an application for a new trial on the ground of newly-discovered evidence are well stated in 20 R. C. L., page 289 et seq., and Tennessee cases applying these rules are cited in Crawford's Tennessee Digest, vol. 5, pp. 4714-4716.

The second, third, and fourth assignments of error are overruled.

The remaining assignment of error is the first in the order assigned, and is that the trial court erred in directing a verdict for the defendant at the conclusion of the plaintiff's evidence, "because there was much material evidence of determinative facts showing negligence on the part of defendant and of plaintiff's right to recover against it."

Directing our attention first to the second count of the declaration, we are of the opinion that there is a failure of evidence of essential facts to support a recovery under the Federal Employers' Liability Act, in that it does not appear that plaintiff's intestate was "employed" by defendant Railway.

"Liability under the statute (the Federal Employers' Liability Act) is limited to responsibility for injuries sustained while the person injured was 'employed' by the carrier sought to be held therefor. The statute does not itself define the meaning of the word 'employee' or the word 'employed,' as used in the act, but it has been authoritatively declared that Congress, using these terms in this connection, referred to and intended to be understood as describing the conventional relation of master and servant." 2 Roberts Federal Liabilities of Carriers (2 Ed.), section 732, pp. 1379, 1380.

"Whatever difficulty there may be in formulating and applying the test of the existence of the relation of master and servant, in each case the establishment of such relation, in conformity to the principles of the common law as construed and applied by the national courts, remains a condition precedent to the applicability of the Federal Liability Statute." Id., section 733, page 1381.

We think the facts of the instant case bring it fairly within the ruling of the Supreme Court of the United States in the case of Robinson v. B. & O. Railroad Co., 237 U. S., 84, 35 S. Ct., 491, 492, 59 L. Ed., 849, wherein that court held that a Pullman porter on an interstate train was not within the federal act.

The determinative question involved in Robinson's Case, supra, was whether Robinson, a Pullman porter, was "employed" by the railroad corporations over whose lines the Pullman cars in his charge were operated. The court held that the question was raised by the defendant's plea of not guilty, and, in the course of its opinion, the court said:

"The 'liability created' by the act is a liability to the 'employees' of the carrier, and not to others; and the plaintiff was not entitled to the benefit of the provision unless he was 'employed' by the railroad company within the meaning of the act. . . . The inquiry rather is whether the plaintiff comes within the statutory description; that is, whether, upon the facts disclosed in the record, it can be said that within the sense of the act the plaintiff was an employee of the railroad company, or whether he is not to be regarded as outside

that description, being, in truth, on the train simply in the character of a servant of another master by whom he was hired, directed, and paid, and at whose will he was to be continued in service or discharged. . . . We think it to be clear that in employing its servants the Pullman Company did not act as the agent of the railroad company. The service provided by the Pullman Company was, it is true, subject to the exigencies of railroad transportation, and the railroad company had the control essential to the performance of its functions as a common carrier. To this end the employees of the Pullman Company were bound by the rules and regulations of the railroad company. This authority of the latter was commensurate with its duty, and existed only that it might perform its paramount obligation. With this limitation, the Pullman Company supplied its own facilities, and for this purpose organized and controlled its own service, including the service of porters; it selected its servants, defined their duties, fixed and paid their wages, directed and supervised the performance of their tasks, and placed and removed them at its pleasure. [Citing authorities.] It is said that the plaintiff had been promoted to be a 'porter in charge' of the Pullman car between Washington and Wheeling, with increased compensation, but he still was the porter of the Pullman Company, employed in its work. It is insisted that he should be regarded as the employee of the railroad company because of the fact that in the case of passengers coming on the train after three o'clock in the morning, he received the railroad ticket or fare, which he placed in an envelope and gave to the train conductor 'when he came back;' the railroad ticket was punched or canceled by the conductor. This, however, was an obvious accommodation to the passenger in the Pullman car, and in any event it was merely an incidental matter which cannot be deemed to qualify the character of plaintiff's employment as it is to be viewed from the standpoint of the statute. We are of the opinion that Congress used the words 'employee' and 'employed' in the statute in their natural sense, and intended to describe the conventional relation of employer and employee. It was well known that there were on interstate trains persons engaged in various services for other masters. Congress, familiar with this situation, did not use any appropriate expression which could be taken to indicate a purpose to include such persons among those to whom the railroad company was to be liable under the act. We conclude that the plaintiff in error was not an employee of the defendant company within the meaning of the employers' liability act, and that the judgment must be affirmed.''

In the instant case, the proof is that plaintiff's intestate was accustomed to collect the railroad tickets or fares from passengers on the Pullman cars between the hours of nine o'clock at night and eight

o'clock on the following morning, and deliver them to the train conductor, and that he was expected to keep the Pullman cars clear of "tramps, bums, hoboes and trespassers." It is claimed by plaintiff that the services thus rendered by the deceased constituted him an employee or servant of the defendant railway.

With respect to the collection of railroad tickets and fares, it was held in Robinson's Case, supra, that such service did not constitute him an employee of the railroad company, and, on that point, we see no basis for a differentiation of the instant case from Robinson's Case.

Obviously, the Pullman company was interested in keeping its cars free from "tramps, bums, hoboes and trespassers," and the fact that it was understood between the train conductor and the Pullman conductor (Wilson) that the latter would perform that service, and that the defendant railway was incidentally benefited thereby, did not, in our opinion, convert the Pullman conductor into a servant of the railway company, when, as the undisputed proof shows, the Pullman company hired him, paid his wages, directed the manner in which he should discharge his duties, and had the power to dismiss him from its service, and he had no contractual relations whatever with the railway company, and received no compensation from the latter. Hull v. Phila. & Reading R. Co., 252 U. S., 475, 40 S. Ct., 358, 64 L. Ed., 670.

There being no evidence that plaintiff's intestate was "employed" by defendant railway, there was a total lack of evidence of one of the conditions precedent to the applicability of the Federal Employers' Liability Act, and there was, therefore, nothing to submit to the jury under the second count of the declaration.

The remaining inquiry is, whether or not there is, in the record, any material evidence to support the averments in the first count of the declaration through which plaintiff charges defendant with negligence and avers that such negligence of defendant was the proximate cause of the injuries and death of her intestate.

Substantially all of the evidence in the record tending to show the manner in which and the circumstances under which the deceased, Harry L. Wilson, fell from defendant's train has been quoted herein. The car from which he fell was a private car, and there is no direct evidence that the platform of said car was equipped with trapdoors over the steps and/or safety gates. There is evidence that some old model private cars are in use without trap doors and safety gates, and that new model cars are equipped with these devices.

But if it be assumed that the facts in evidence would justify an inference that the car in question was equipped with safety gates and trapdoors, and that they were open at the time the deceased fell from the car, there is no evidence tending to show when or by whom they

were opened. For aught that appears in the evidence before the jury, they may have been open from the time the train left Chattanooga six miles away, or they may have been opened later; they may have been opened by some member of defendant's train crew, or by a trespasser, or by the deceased himself.

The deceased may have known that the trapdoor was open, or he may not. The cause of his fall and the proximate cause of his injuries and death are matters of speculation and conjecture, and a verdict cannot be based on conjecture. Buckeye Cotton Oil Co. v. Campagna, 146 Tenn., 389, 396, 242 S. W., 646; Louisville & N. Railroad Co. v. Jackson, 3 Tenn. App., 463, 472; Tenn. Cent. Railway Co. v. Williams, 9 Tenn. App., 529, 533; Louisville & N. Railroad Co. v. Dillehay, 3 Tenn. App., 476, 482, and other cases therein cited.

Without undertaking to define the degree of care which defendant railway owed to the deceased (a Pullman conductor) under the circumstances disclosed by the record, we may certainly assume that it was no higher than that required of a carrier towards a passenger on one of its trains.

Upon proof of an injury to a passenger, no presumption against either the carrier or the passenger arises. It is incumbent on the plaintiff to go further and show not simply the injury, but that it was the result of some negligence of the carrier. East Tennessee, V. & G. R. Co. v. Mitchell, 11 Heisk., 400.

In a note to the case of Brown v. Union Pacific Railroad Co., 29 L. R. A. (N. S.), 808, it is stated, with citation of supporting authorities, that no presumption of negligence on the part of a carrier arises from the mere fact that a passenger is injured, but the plaintiff must allege and prove that the injury was caused by some person or thing connected with the carrier's railroad or business of transportation; and where a passenger is killed by falling or being thrown from a moving train, there is no presumption of negligence of the carrier until the cause of the accident is shown, and shown to be something under the control of the carrier or its servants.

In the case of Brown v. Union Pacific Railroad Co., 81 Kan., 701, 106 P., 1001, 29 L. R. A. (N. S.), 808, supra, the trial court sustained a demurrer to the evidence, and, on appeal, the Supreme Court of Kansas said:

"We have the question squarely presented whether negligence on the part of the railroad company is to be inferred from the bare facts that a passenger is riding upon a vestibule passenger train which arrives at the station of his destination, and immediately after it has departed therefrom he is found mangled beside the rail in such manner that it is evident that his injuries were received by his being run over by the wheels of the train. Many authorities are cited to the effect that where a train or coach in which a passenger is riding

is derailed, or where some other accident happens to the train occasioned by defects in the appliances thereof or in the track, and injury to a passenger occurs by reason thereof, negligence on the part of the railroad company is to be presumed. In all such cases the presumption is founded upon proof of facts sufficient to account for the injuries sustained, and, in the absence of any other cause for the injury being proven, the natural presumption is that it occurred through the negligence of the railroad company; special emphasis being given to the great degree of care and precaution required of railroad companies in the transportation of passengers for their safety.

"The circumstances in this case necessarily indicate that some one of the vestibules of the train was opened at least 300 or 400 feet before the train stopped at the station. The evidence of the appellants shows that the deceased was somewhat accustomed to traveling upon trains, especially the trains of the appellee, in shipping stock to Kansas City and returning on its trains, and it is not a longdrawn presumption that men accustomed to traveling upon vestibule trains know how to open the vestibules. It is a very simple matter, as detailed by the evidence, and the method of opening is apparent to any man of mature life and experience. Neither does it require any great physical exertion. Whether a porter or some employee of the railroad company [appellee] opened a vestibule out of which the deceased must have fallen, or whether he opened it himself, is a matter simply of conjecture. However the vestibule may have been opened, it is also a matter simply of conjecture how he happened to fall. There is no evidence of anything unusual either in the speed of the train or in the manner of its stopping. It is not a necessary or even a usual incident for a person who happens to be in a vestibule that is open to fall out of it. The presumption is that the deceased was in the exercise of due care for his own safety, and it is probably also a fair presumption that he was in the possession of his usual faculties, and able to care for himself. It is also a fair presumption, there being no evidence to the contrary, that the vestibule was fairly well lighted in the usual way. All these presumptions being indulged do not account for the accident. On the other hand, they indicate that no such accident could have occurred. But an accident did occur, which resulted in the death of the passenger. What was the proximate cause of the accident, and who was in fault? The evidence affords no answer to these questions. Neither does any presumption afford any answer thereto.

"The appellants, unable to find in the evidence any specific answer to these questions, invoke the doctrine of res ipsa loquitur, which simply means 'The thing or the circumstances speak for themselves.' If a passenger be found dead in a wrecked train immediately or

soon after the wreck occurred, the passenger having been seen sitting in a seat of a coach therein shortly before the accident happened, and there is nothing else shown to account for the death, the doctrine invoked would apply. It applies in this case to the cause of the injury. The deceased having been found mangled by the side of the rail, with the legs on the other side of the rail crushed and dissevered from the body, the circumstances speak for themselves that the injury occurred by the train passing over the body. The circumstances do not, however, indicate how the person happened to fall under the train, or as to whose fault occasioned the fall, if it be the fault of any one. In this case the vestibule from which the fall occurred may have been negligently left open by the employees of the railroad company [appellee], and the vestibule may have from some unknown causes become darkened, and the deceased may have passed into the vestibule, moved by the natural impulse of reaching home as soon as possible, and, unable to see that the doors of the vestibule were already opened, have advanced to open them, and have fallen to his destruction through the fault of the employees, and without any fault on his part. Again, deceased may have been suffering from vertigo in the smoking car, and have passed into the vestibule and opened it for himself, and from dizziness have fallen out of it without any fault on his part or on the part of any employee of the railroad company [appellee]. As before said, it is all conjecture. To sustain an action for the alleged negligence of another, it devolves upon the party asserting negligence to produce sufficient evidence at least to make a prima facie case that his alleged damages occurred through the neglect of some duty which the other party owed to him, and, until he has done so, he has failed to produce evidence sufficient to sustain a cause of action. Hart v. St. Louis & S. F. R. Co., 80 Kan., 699, 102 P., 1101.

"We are compelled to hold with the court below that the appellants in this case failed to offer such proof, and the judgment of the court below is affirmed."

And so, in the case now before us, we find no evidence in the record that the death of plaintiff's intestate was the result of negligence of the defendant railway, and the first assignment of error is overruled.

It results that the judgment of the circuit court dismissing plaintiff's suit is affirmed, and judgment will be entered accordingly.

The costs of the appeal will be adjudged against the plaintiff, Mrs. Katie C. Wilson, as administratrix of the estate of Harry L. Wilson, deceased.

Crownover and DeWitt, JJ., concur.