**STATE of Tennessee**

v.

**Michael Bruce McCLOUD.**

Court of Criminal Appeals of Tennessee, at Knoxville.

March 25, 2009 Session.

June 12, 2009.

Mark E. Stephens, District Public Defender, and Christy Murray, Assistant District Public Defender, for the appellant, Michael Bruce McCloud.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Sarah Winningham and Leon Franks, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

A Knox County Criminal Court jury convicted the defendant, Michael Bruce McCloud, of driving under the influence, second offense, and the trial court imposed a sentence of 11 months and 29 days. In this appeal, the defendant asserts that the trial court erred by denying his motion to dismiss, that the trial court erred by denying his motion to exclude the blood alcohol test results as violative of Tennessee Code Annotated section 55–10–406, that the court erred in denying his bid to exclude the testimony of a police officer who opined about "occupant kinetics" inside a vehicle, that the trial court erred by limiting his cross-examination of a State's witness, and that the evidence was insufficient to support his conviction. Discerning no error, we affirm the judgment of the trial court.

The conviction arose in this case from a February 20, 2004 automobile accident involving the defendant and his friend, Rusty Harpe. At trial, Mr. Harpe testified that on February 20, 2004, he and the defendant "went out to a strip club" and "got very, very drunk." According to Mr. Harpe, the two left the club in Mr. Harpe's car with the defendant driving and Mr. Harpe in the passenger's seat. Mr. Harpe testified that after leaving the club, they "had a wreck," but he could not recall the details of the crash. He said, "I remember wrapped around the telephone—or down in the ravine, sitting in the passenger side. And I got out. I did not see [the defendant] in the car. I got out and seen him behind the car." Mr. Harpe stated that he did not remember why he was not driving, explaining, "Too drunk. Way too drunk. I . . . do remember vomiting. Now, why I was not driving the car, I don't know. That's not an answer I can really give, why I was not driving." Mr. Harpe stated that he did not "[n]ormally" allow others to drive his car, but he added, "If I've had too much to drink, I will not drive."

Mr. Harpe testified that he could not recall why he left the scene of the accident, but he insisted that he "did not leave because [he] was scared of what had happened." He stated further, "I did go to get help." According to Mr. Harpe, he walked from the scene to his house, which was "only about maybe a half mile, three quarters of a mile" away and "yell[ed] for [his] grandmother." He testified that his grandmother "was picking up the phone and then two police officers pulled in to [the defendant's] house, which was right next door." He told the officers that "he

was the other passenger in the car," and the officers transported him back to the accident scene.

Mr. Harpe testified that he "did not think" he was injured in the accident, but he admitted that he went to the hospital on the day following the accident for a "bang on the side of [his] head." He said that although the "medical records show[ed] otherwise," he could not recall going to the hospital. He did recall traveling with a police officer to the University of Tennessee Medical Center on the night of the accident for the purpose of having his blood drawn for alcohol content testing. He stated that he was arrested that night and charged with "DUI by consent" for allowing the intoxicated defendant to drive his car.

Mr. Harpe testified that he reached an agreement with the State that allowed him to plead guilty to a misdemeanor charge of "unlawful usage" in exchange for his testimony against the defendant.

During cross-examination, Mr. Harpe admitted that he drove to the club and that the defendant had never driven his car before that evening because it was Mr. Harpe's "preference" that no one else drive his car. He conceded that the car went down an embankment, crashed into trees, and broke a telephone pole and that the car was "[c]ompletely totaled." After the accident, Mr. Harpe got out of the car and went to his house. Although he could not recall any specifics about the visit, Mr. Harpe acknowledged going to Parkwest Hospital later in the day of the crash complaining of pain in both legs and a laceration on the back of his head. He could not recall telling the treating physician that his left leg was "throbbing" or the physician's diagnosis of a deep bone bruise to his left leg.

Mr. Harpe also admitted that his insurance company refused to pay the balance due on his car loan or any of his medical expenses because alcohol was a factor in the accident. The insurance company also refused to pay the $2,500 he was charged by the City of Knoxville for the replacement of the telephone pole.

Mr. Harpe conceded that although he had testified that he did not drink and drive, he was serving a sentence of probation for a driving under the influence ("DUI") conviction at the time of trial. Mr. Harpe acknowledged that he understood that the penalties for DUI convictions increased with each subsequent conviction.

Despite his concession that he had been convicted of DUI, on redirect examination, Mr. Harpe testified that the defense's questioning did not "make [him] feel too well" because he had not "been convicted of DUIs." He said, "I don't like for things to be brought up if I wasn't convicted of the charge...." He again admitted his prior felony conviction of aggravated burglary, stating, "I have to admit when I was younger I used to raise a lot of cane.... But ... people do change. And since '01 I have this DUI ... and ... I have a DUI that two months ago I pled guilty to from two years ago." Mr. Harpe agreed that he "chose" to testify against the defendant even though he was aware he would be questioned about his prior convictions.

During recross-examination, Mr. Harpe conceded that his testimony against the defendant was required in order to receive the reduction in his charge of DUI by consent.

Following Mr. Harpe's testimony, the State introduced by stipulation the alcohol and toxicology reports generated on February 20, 2004, for both the defendant and Mr. Harpe. The reports indicated that the defendant had a blood alcohol content of

.11 percent and that Mr. Harpe had a blood alcohol content of .16 percent.

Knox County Sheriff's Department Officer Tom Walker, who was on patrol when the automobile accident occurred on February 20, 2004, testified that he received the initial call "[a]t one o'clock in the morning" and that he proceeded to the accident scene, which was .4 miles south of Kingston Pike on Ebenezer Road. He found the car in a ditch and the defendant "standing next to the passenger side of the vehicle." Officer Walker recalled that he told the defendant not to move because the defendant "had an obvious leg injury. There was a bulge that was in his skin that was sticking out through the rip in his pants." At that point, the defendant asked, "[W]here's Rusty?" and told Officer Walker that "Rusty" was "the guy that was with [him]." Officer Walker and other emergency personnel began searching for "Rusty" in the nearby woods.

Another officer learned that the vehicle was registered to an address "just a half mile to three quarters of a mile up the road." That officer proceeded to the residence, where he located Mr. Harpe and brought him back to the scene. Emergency personnel placed the defendant on a backboard and "immobilized his leg in a brace because of the obvious leg injury to the left side." Officer Walker stated that the defendant also had "multiple cuts and bruises to the left side of his face." He said, "It was almost like you drew a line right down the center of his face. Everything was on the left side of the body, arms, face area, were all cut and bloody and blood was coming down onto his clothes."

Officer Walker stated that he "could smell the odor of an alcoholic beverage on [the defendant]" and that the defendant "had blood shot eyes, his speech was slurred." Officer Walker stated that these signs led him to believe that the defendant "had been drinking and driving."

Officer Walker testified that Mr. Harpe "had cuts and bruises and everything to the right side of his body." He stated that Mr. Harpe "was obviously intoxicated, blood shot eyes, slurred speech. He couldn't stand very well either." Officer Walker transported Mr. Harpe to the hospital in his police cruiser. Mr. Harpe told Officer Walker that the car, which was registered to Mr. Harpe's grandmother, "was basically his. He was making the payments, that kind of stuff." Mr. Harpe also told Officer Walker that the defendant had been driving the vehicle when the accident occurred.

Officer Walker testified that based upon the damage to the vehicle and the injuries suffered by the defendant, he concluded that the defendant was driving the vehicle at the time of the accident. He explained:

The evidence at the scene was the car, while going around a slight curve, went over the center line, and the driver over corrected and started to skid sideways. He was unable to recover from the skid, went off the road, hit the telephone pole right in the driver's side door. This caused the car to rotate on 180 degrees, go down in the ditch a little further, and hit another stand of trees, about three of them, after traveling another 20 feet. It rotated another 180 degrees, traveled over 19 feet, and hit two more trees, becoming wedged in between these two trees, with the only door being able to open was the passenger side.

Based on the injuries and the extent of the injuries on the two people that were in the car, it is my opinion that Mr. McCloud as the initial impact, as you will see by the pictures, if I am the driver and I come into—hit a telephone pole at high speed, my body is going to go to the left, because the body is in

motion, is going to keep in motion until the wreck of an outside force. He came in contact with an unmovable object. The telephone pole and the door, causing his major injuries to his left side. Plus, the glass breaking right next to his head on the driver's side glass causing cuts only to the left side of his face.

When the car rotated 180 degrees, my opinion, Mr. Harpe was a passenger, when they hit those trees behind him, it was not the same kind of impact. He's already lost speed, he's already lost momentum, it's not the same type of impact. He hits, of course, on his side so the body tends to go back this way. He comes in contact with the door on his side, causing injury to his right knee, which apparently in the hospital report he had an injury to his right knee. The glass breaks again right here next to his face causing the cuts and bruising to the right side of his face.

Following voir dire of Officer Walker on the issue of his training and experience, the trial court declared the officer "an expert in the field of accident reconstruction." The court ruled "[t]hat would include issues such as the position of people within the vehicle." Officer Walker then reiterated that the defendant's injuries, which were confined to the left side of his body, led him to conclude that the defendant had been driving the vehicle at the time of the accident. He testified that the defendant's injuries could not have been caused by his striking the center console of the vehicle, explaining:

If [the defendant] had been the passenger, and had struck that console hard enough to cause the major injury, crushing injuries to his left side, that console being this flimsy, would have had major damage. Something that I could have detected, that something came in major

contact with that device, versus a door which is designed to stay shut.

He added that had he been driving, "Mr. Harpe would have had serious injuries to [the left] side. And he did not."

Testing of blood samples provided by the defendant and Mr. Harpe following the accident established the defendant's blood alcohol content as .11 percent and Mr. Harpe's blood alcohol content as .16 percent. Based upon these results, Officer Walker charged the defendant with DUI as the driver of the vehicle and Mr. Harpe with DUI by consent for allowing the defendant to drive his car while intoxicated.

During cross-examination, Officer Walker acknowledged that he had not reviewed the defendant's medical records and that he had based his opinions on only those injuries he observed on the night of the accident. He stated that he had reviewed Mr. Harpe's medical records after they were subpoenaed by the State in anticipation of the trial. According to the officer, Mr. Harpe's records supported his opinion because they indicated injuries to Mr. Harpe's right knee and cuts and bruises on the right side of his face.

The defendant testified that on the evening before the accident, he and Mr. Harpe began "hanging out" at Mr. Harpe's house at approximately 5:30 p.m. The two men, along with the defendant's ex-wife and Mr. Harpe's girlfriend, were "drinking and ... playing cards and whatnot." The defendant stated that he left Mr. Harpe's residence at approximately 9:30 p.m. but returned after his wife went to bed. He recalled that he drank "a couple more beers" and that he and Mr. Harpe "just kinda chilled out." At some point, Mr. Harpe suggested that the two go to the "Mouse's Ear," a nearby strip club.

The defendant testified that Mr. Harpe drove them in his Buick Regal and that they stayed at the club for approximately

one and a half hours. According to the defendant, he and Mr. Harpe took beer to the Mouse's Ear because the club does not serve alcoholic beverages. He recalled that Mr. Harpe drank six beers while at the Mouse's Ear and that he drank "three or four" beers while there. When they left the Mouse's Ear at 12:30 a.m., Mr. Harpe was driving. The defendant testified that he had never driven Mr. Harpe's car. According to the defendant, the last thing he could remember was falling asleep at the traffic light "next to Rafferty's on Ebenezer." The defendant stated that he did not awake during the accident, explaining, "Well, when I woke up, I was in a ditch, and, you know, just the ... shock, you know, because I didn't know what had happened, and it took me a few minutes to realize what had happened."

The defendant testified that when he realized there had been an accident, he became "worried" about Mr. Harpe, fearing that "he might have got ejected or something and was maybe in front of the car." He decided to look for Mr. Harpe, "so [he] opened the passenger's side door and pulled [him]self up and out." He explained that he "was in real pain" and that he was unable to bear any weight on his left leg. The defendant stated that he used the door panel to brace himself as he shouted for Mr. Harpe. He was still standing next to the door when Officer Walker arrived. The defendant speculated that Mr. Harpe had used the back window of the car, which had been shattered, to exit the vehicle.

The defendant testified that he was taken by ambulance to the University of Tennessee Medical Center where he was treated for a fractured pelvis. He indicated that the fracture occurred "somewhat below the left side of his belt and towards the back." He stated that he did not have a broken leg and that he did not have any

"protrusion" on his left leg. The defendant also testified that he suffered a large cut on his right ear. He stated that Mr. Harpe lied when he said that the defendant was driving at the time of the accident.

During cross-examination, the defendant conceded that he had consumed approximately 12 beers on the night of the accident and that he was drunk.

The State called Officer Walker in rebuttal. Officer Walker testified that the condition of the vehicle established that Mr. Harpe did not exit the vehicle through the rear window. He explained,

After a wreck, especially of this magnitude, when it goes into debris and dirt, dust goes up and then it settles back down into the car. And as you can see, there's dust all over the trunk area of the vehicle.

If a person had climbed out that direction, there would be foot scuff marks, hand-prints where they've actually moved the debris. This debris has not been moved in any way where anybody could have climbed out that way.

. . . . .

.... You'll notice that both seats are upright and intact. Neither one has been broken back.

In order—under the theory of the Defense, for him to have climbed out through the back, he would have had to turn through the air bag, through the steering wheel, go in between the seats that were upright, climb out through the back window over the deck that was pointed up, across the broken glass and across the trunk and not leave any marks. There's no evidence that he would have been able to go out that way.

Officer Walker also testified that Mr. Harpe could not have exited the vehicle via the driver's side window "because it was

right up against the tree, and a human body couldn't have fit in between there, especially the size of Mr. Harpe."

At the conclusion of the trial, the jury returned a verdict of guilty of DUI. After a second proceeding wherein the State introduced certified copies of the defendant's driving history from the Department of Safety and his previous conviction of DUI, the jury found the defendant guilty of second offense DUI.

## I. Commencement of Prosecution

In his first assignment of error, the defendant contends that the trial court erred by denying his motion to dismiss because, he asserts, the prosecution was not commenced within the 12–month time frame provided by Tennessee Code Annotated section 40–2–102. The State asserts that the prosecution in this case commenced with the issuance of the affidavit of complaint on February 20, 2004, the date of the offense. In the alternative, the State submits that the prosecution commenced when the defendant was bound over to the grand jury in October 2004, some eight months after the offense.

Because the facts regarding this issue are not in dispute and because our analysis employs the construction and interpretation of various statutes and the rules of criminal procedure, our review is de novo with no presumption of correctness afforded to the ruling of the trial court. *State v. Ferrante*, 269 S.W.3d 908, 911 (Tenn.2008).

■ The defendant was convicted of the misdemeanor offense of DUI, second offense. T.C.A. §§ 55–10–403(a)(1), 39–11–110 (2003). Tennessee Code Annotated section 40–2–102 provides that "[e]xcept as provided in § 62–18–120(g) and subsection (b) of this section, all prosecutions for misdemeanors shall be commenced within twelve (12) months next after the offense has been committed." T.C.A. § 40–2–

102(a). The purpose of this limitations period "is to protect a defendant against delay and the use of stale evidence and to provide an incentive for efficient prosecutorial action in criminal cases." *State v. Nielsen*, 44 S.W.3d 496, 499 (Tenn.2001). Statutes of limitation are construed "liberally in favor of the criminally accused." *Ferrante*, 269 S.W.3d at 911 (citing *State v. Henry*, 834 S.W.2d 273, 276 (Tenn.1992)).

■ Tennessee Code Annotated section 40–2–104 provides that a prosecution is commenced by the following:

> finding an indictment or presentment, the issuing of a warrant, binding over the offender, by the filing of an information as provided for in chapter 3 of this title, or by making an appearance in person or through counsel in general sessions or any municipal court for the purpose of continuing the matter or any other appearance in either court for any purpose involving the offense.

T.C.A. § 40–2–104. This section "provides for the commencement of a prosecution by several methods, 'all deemed to provide the defendant with sufficient notice of the crime.'" *Ferrante*, 269 S.W.3d at 914 (quoting *State v. Tait*, 114 S.W.3d 518, 522 (Tenn.2003)). "'A lawful accusation is an essential jurisdictional element of a criminal trial, without which there can be no valid prosecution.'" *Id.* (quoting *State v. Morgan*, 598 S.W.2d 796, 797 (Tenn.Crim. App.1979)). Our supreme court "has long recognized that, 'prior to formal accusation, [a] defendant's rights are protected by the statute of limitations.'" *Id.* (quoting *State v. Baker*, 614 S.W.2d 352, 354 (Tenn. 1981)).

■ Because the defendant was not indicted until August 2005, more than 12 months after the offense, we must determine whether some other event occurred before the filing of the indictment that was

sufficient to commence the prosecution in this case. As indicated, the State asserts that "the defendant's prosecution commenced on February 20, 2004, with a valid affidavit of complaint charging him with a second offense of driving under the influence." The plain language of Code section 40–2–104 provides five specific ways by which a prosecution may be commenced, and an affidavit of complaint is not listed among the alternatives. *See* T.C.A. § 40–2–104. An affidavit of complaint is merely "a statement alleging that a person has committed an offense," *see* Tenn. R.Crim. P. 3, and is not, standing alone, sufficient to provide formal notice of the offense charged, *see State v. Richard Gastineau,* No. W2004–02428–CCA–R3–CD, slip op. at 4, 2005 WL 3447678 (Tenn.Crim.App., Jackson, Dec. 14, 2005). Because an arrest warrant may or may not issue upon the affidavit of complaint, the "affidavit of complaint will not necessarily provide a defendant with notice that he is being charged with an offense, and an affidavit of complaint, with nothing more to provide a defendant with notice, is not a charging instrument." *See id.*

■ Similarly, a citation issued by an officer in lieu of a custodial arrest is not a "formal accusation." Just as a warrantless custodial arrest does not, alone, commence a prosecution, a citation issued in lieu of an arrest is not the result of an independent probable cause determination and, therefore, does not mark the beginning of the prosecution. *See State v. Best,* 614 S.W.2d 791, 795 (Tenn.1981) (holding in the case of a warrantless arrest that without a "follow-up" determination of probable cause either through the issuance of a warrant or a binding over to the grand jury "the criminal prosecution terminates"); *see also Ferrante,* 269 S.W.3d at 912 (noting that Rule 5(a) of the Tennessee Rules of Criminal Procedure requires those defendants arrested without a warrant be taken before a magistrate for the lodging of " 'formal' " charges by the filing of the affidavit of complaint and issuance of a warrant). Indeed, the Advisory Commission Comments to Rule 4 of the Tennessee Rules of Criminal Procedure note clearly that, even in cases of warrantless arrest, the arrest warrant issued upon the affidavit of complaint rather than the affidavit of complaint itself "still serves as the official charging instrument, issued after a judicial finding of probable cause, and gives notice of the charge which must be answered." Tenn. R.Crim. P. 4, Advisory Comm'n Comments. In consequence, the affidavit of complaint and citation in lieu of arrest issued to the defendant on February 20, 2004, did not commence the prosecution in this case.

■ The State also contends that the prosecution in this case could have commenced when the defendant's case was bound over to the grand jury by the general sessions court. Citing *Ferrante,* the defendant asserts that because the affidavit of complaint did not allege the essential elements of the offense, the bind-over order was ineffective to commence the prosecution in this case.

The defendant's argument overlooks entirely the probable cause finding of the general sessions court, which occurred within the statute of limitations period. Code section 40–2–104 provides that a prosecution may commence by the court's "binding over the offender." In this case, the indictment provides that the defendant's case was bound over to the grand jury on October 26, 2004, well within the statute of limitations. In *Ferrante,* Ferrante's case was not bound over to the grand jury before the expiration of the statute of limitations, and as a result, the State sought to rely upon Ferrante's various appearances in the general sessions

court as the start of the prosecution. Our supreme court ruled that a defendant's appearance in the general sessions court will only mark the commencement of the prosecution under Code section 40–2–104 where the underlying affidavit of complaint is valid. *See Ferrante*, 269 S.W.3d at 914–15.[2] In this case, unlike *Ferrante*, there was a judicial finding of probable cause and a statutorily sufficient commencement of the prosecution within 12 months of the commission of the offense. Thus, the prosecution in this case commenced within the period provided by law.

## II. Admission of Blood Alcohol Test

■ The defendant next asserts that the trial court erred by denying his motion to exclude the blood alcohol test results as violative of Tennessee Code Annotated section 55–10–406(a)(1) (2006). The State contends that the trial court properly admitted the test results.

At the hearing on the motion to suppress, Officer Walker testified that he was dispatched to the accident scene at 1:00 a.m. on February 20, 2004. When he arrived, he saw the defendant standing next to the wrecked vehicle. The defendant told Officer Walker that he could not remember if he had been driving the car when the accident happened and that he could not find his friend, who had been with him in the car. Officer Walker stated

that he conducted "about another half hour's investigation," during which time Officer Walker noticed the odor of an alcoholic beverage on the defendant and located an empty beer bottle inside the car. At the conclusion of this investigation period, other officers discovered Mr. Harpe at his residence. According to Officer Walker, he determined that the defendant would be arrested and charged with DUI "[a]t the point when [he] found [Mr. Harpe] at his home. We brought him down and interviewed him. He was more coherent. Told us they had been drinking all night . . . and . . . he allowed [the defendant] to drive the car." By that time, the defendant had been transported to the hospital, so Officer Walker "went to the hospital and cited Mr. McCloud for DUI."

During cross-examination, Officer Walker testified that immediately upon his arrival on the scene, he instructed the defendant not to move "because he said his leg hurt." Officer Walker added that he told the defendant, "I have an ambulance on the way." He said that his attention was then diverted to the search for the missing occupant, which search took "[p]robably about 20 minutes." He admitted that upon smelling the odor of alcohol, he decided to ask the defendant to submit to a field sobriety test.

The "Knox County Sheriff's Office Alcoholic Influence Report" filed as an exhibit

---

**2.** We note that the supreme court repeatedly referred to the affidavit of complaint in *Ferrante* as "the purported charging instrument." *See Ferrante*, 269 S.W.3d at 909, 912, 914, 915. However, a careful reading of the case establishes that the officer who executed the affidavit of complaint attempted to comply with the necessary steps for the issuance of an arrest warrant by presenting the affidavit of complaint to the court clerk, who signed it as a "neutral and detached" magistrate. *Id.* at 910. Because the clerk had no authority to make a probable cause determination, however, the supreme court ruled that the "affidavit

of complaint was void ab initio." *Id.* at 915. Moreover, Code section 40–2–104 clearly states the means by which a prosecution may be commenced, and the issuance of an affidavit of complaint is not listed among the alternatives. *See* T.C.A. § 40–2–104. In addition, the rules of procedure provide that the arrest warrant rather than the affidavit of complaint is the "formal charging instrument." Tenn. R.Crim. P. 4, Advisory Comm'n Comments. We surmise that the high court did not intend to suggest that an affidavit of complaint, standing alone, can serve as a charging instrument.

to Officer Walker's testimony reflects that the defendant was taken into custody at 1:30 a.m. The "Alcohol/Toxicology Request" also exhibited to Officer Walker's testimony reflects that the defendant's blood was drawn at 3:20 a.m.

The defendant testified that when Officer Walker arrived on the scene, he told the defendant, "Don't move. Stay right there." He stated that he would not have been able to move because of his injuries. He admitted during cross-examination that Officer Walker never told him that he was under arrest and that he left in the ambulance without speaking to the officer.

At the conclusion of the hearing, the trial court specifically accredited Officer Walker's testimony that he "conducted some initial investigation before he made any determination about who he could even charge." The court concluded that the defendant's blood was drawn "within the two-hour period and is admissible for that reason." The trial court noted that "this statute is going to have to be interpreted a little bit different than the Fourth Amendment areas that we would normally rely on."

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn.2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R.App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn.1998). We review the issue in the present appeal with these standards in mind.

At the time of the hearing in this case, Tennessee Code Annotated section 55–10–406 provided, in pertinent part, as follows:

Any person who drives a motor vehicle in this state is deemed to have given consent to a test or tests for the purpose of determining the alcoholic content of that person's blood, a test or tests for the purpose of determining the drug content of such person's blood, or both such tests. However, no such test or tests may be administered pursuant to this section, unless conducted at the direction of a law enforcement officer having reasonable grounds to believe such person was driving while under the influence of alcohol, a drug, any other intoxicant or any combination of alcohol, drugs, or other intoxicants as prohibited by § 55–10–401, or was violating the provisions of §§ 39–13–106, 39–13–213(a)(2) or 39–13–218. For the results of such test or tests to be admissible as evidence, it must first be established that all tests administered were administered to the person within two (2) hours following such person's arrest or initial detention.

T.C.A. § 55–10–406(a)(1) (2006).[3]

Here, the trial court accredited the testimony of Officer Walker that he did not detain the defendant immediately upon his arrival at the accident scene and that he investigated the scene for 20 to 30 minutes before deciding to charge the defendant with DUI. Moreover, the documents exhibited to Officer Walker's testimony confirm that the defendant was not placed under

---

3. The legislature adopted the amendment including this language in 2005. The last sentence, which created the two-hour limitation, was deleted as of January 1, 2009. *See* Tenn. Pub. Acts 2008, ch. 957, § 1.

arrest until 1:30 a.m., one hour and 50 minutes before his blood was drawn for alcohol content testing. Witness credibility and the resolution of conflicts in the proof are clearly the province of the trial judge, and we will not disturb the conclusions of the trial judge in this case.

### III. Expert Testimony

The defendant next contends that the trial court erred by permitting Officer Walker to testify as an expert witness on the issue of the position of the occupants of the vehicle during the crash, a field the defense deems "occupant kinetics." The State asserts that the trial court properly allowed Officer Walker to testify as an expert.

During a pretrial hearing to determine whether Officer Walker would be permitted to testify as an expert witness, he testified that he "received basic accident investigation training in [the] police academy and then advanced accident investigation also during the academy." In addition, he stated that he "went to the fatal accident investigator's course, which is a specialty course to investigate fatal accidents." He stated that the advanced accident investigation course "teaches you to go a little more in depth as far as scientific evidence to determine who the driver is and who's lying to you and who is not lying to you." According to Officer Walker, the fatal accident investigation course "goes more in depth on the mechanics of the car and then more in depth as to how an accident really happens." He added, "And then we can also determine, based on injuries to people and everything else, where they were seated in the car." Officer Walker explained the difference between skid marks and yaw marks, and how each can be useful in determining the speed and trajectory of the vehicle during an accident. He stated that in his 14 years as a police officer, he had investigated 20 fatal accidents and well over one hundred nonfatal accidents.

During cross-examination, Officer Walker admitted that he did not possess a degree in either physics or medicine. He also admitted that he had never been qualified as an expert in accident reconstruction. Officer Walker testified that he based his opinion that the defendant was the driver of the vehicle in part on his interview of the defendant and his observation of the defendant's injuries. He stated that the emergency medical personnel told him the defendant likely had a broken left femur. He admitted that he later learned the defendant had broken his left hip rather than his leg. He stated the only impact sufficient to cause such an injury was the initial impact of the driver's side door and the telephone pole. Officer Walker added that the fact that the defendant's injuries were confined to the left side of his body and that there was no damage to the center console of the vehicle contributed to his determination that the defendant had been driving at the time of the accident. Officer Walker conceded that he did not review the defendant's medical records.

At the conclusion of Officer Walker's testimony, the State offered him as an expert witness to provide testimony on

> his investigation dealing with the injuries of the individuals, looking a[t] the point of impact on the vehicle, and applying those two things together, the physics involving the point of impact, the way it was turning, and the injuries that were consistent with those impacts on the vehicle to determine the occupant positioning of the occupants of the vehicle.

At the conclusion of the hearing, the trial court overruled the defendant's objection, ruling:

It appears to me that the officer, if it's relevant, will be able to testify based on his experience and training about accidents and what he knows from his training and experience. As far as what is the opinion of what caused the accident, the . . . order of the events as far as how the car impacted on several different occasions, I, quite frankly, don't think that those opinions go to who the driver was, on the issue of the driver. If it ends up being solely based on the location of the injuries, I think that really qualifies under Rule 701 as opinion testimony by a lay witness.

But the other areas, if the State puts those on, I find he is qualified to testify about accidents and the opinions he's testified to today. Those would be admissible based upon his experience and training under Rule 702.

At trial, the State again had Officer Walker relate his training and experience, and, on the basis of that testimony, the trial court declared the officer an expert in "accident reconstruction" and ruled that his expertise "would include issues such as the position of the people within the vehicle."

Initially, we note that it is not entirely clear whether the trial court allowed Officer Walker to offer his expert opinion that the defendant was the driver of the vehicle or to offer lay opinion that, based on his observations of the defendant's injuries, the defendant was the driver of the vehicle. As such, we will analyze each theory of admission in turn.

■ First, we note that the admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257 (Tenn.1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Its counterpart, Rule 703, focuses on the reliability of expert opinion testimony. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *State v. Copeland,* 226 S.W.3d 287, 301 (Tenn.2007); *State v. Ballard,* 855 S.W.2d 557, 562 (Tenn.1993).

■ Here, Officer Walker testified that he had been trained in accident investigation at the police academy and that he had taken further training in the investigation of fatal accidents, which he described as "more in-depth" than the police academy training. He stated that this training specifically included training to discern the relative positions of the vehicle's occupants at the time of the accident. He also noted that he had investigated more than one hundred non-fatal accidents and 20 fatal accidents prior to the accident in this case. This training and experience, in our estimation, permitted him to testify as an expert witness regarding the mechanics of the accident in this case, particularly the movement of the car during the accident and the force applied to the car at the various points of impact. Furthermore, because Officer Walker testified that he had been trained to use the mechanics of the accident to determine the positions of occupants within the vehicle, the trial court properly determined that he was entitled to provide an expert opinion that the defendant was driving the vehicle at the time of the accident.

In our view, this court's ruling in *State v. William Earl Murphy,* No. 15, 1990 WL 40995 (Tenn.Crim.App., Jackson, Apr. 11, 1990), is distinguishable from the defendant's case because Officer Walker, unlike the patrolman in *William Earl Murphy,* testified that he had received particular training to · surmise the position of the vehicle's occupants during the crash, which we termed "occupant kinetics."[4] Although the defense argues that Officer Walker's lack of a degree in either physics or medicine precluded him from offering testimony about occupant kinetics, we note that *William Earl Murphy* states only "a general grasp" of "physics or mechanics, engineering or mathematics" is required. Officer Walker's qualifications meet this requirement.

 As indicated, the trial court ruled prior to trial that Officer Walker would be allowed to offer his opinion as a lay witness that the defendant was driving the vehicle. Lay witnesses may give testimony in the form of an opinion where the testimony is "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). The testimony is not objectionable merely because it embraces an ultimate issue before the jury. Tenn. R. Evid. 704. However, the admission of lay opinion testimony is limited to those situations wherein the jury could not readily draw its own conclusions on the ultimate issue, without the aid of the witness's opinion testimony. *Blackburn v. Murphy,* 737 S.W.2d 529, 533 (Tenn.1987). Where "'the subject of [a non-expert's] inference [from the facts is] well within the range of common knowl-

edge,' then a question calling for a conclusion of a lay witness or an answer offering an opinion of a lay witness on an ultimate issue is generally improper." *Id.* at 532 (quoting *Nat'l Life & Accident Ins. Co. v. Follett,* 168 Tenn. 647, 663, 80 S.W.2d 92, 98 (1935)). When the admission or exclusion of opinion evidence is challenged on appeal, it is reviewable only for abuse of discretion. *See, e.g., State v. Gray,* 960 S.W.2d 598, 606 (Tenn.Crim.App.1997).

 Officer Walker testified that because the defendant suffered the greater injury of the two occupants and because that injury was to the left side of the defendant's body, he had concluded that the defendant was the driver of the vehicle. Because the jury could have easily drawn this conclusion for itself based upon Officer Walker's testimony about the defendant's injuries and the condition of the vehicle, the trial court should not have allowed the officer to offer a lay opinion that the defendant was the driver of the vehicle. Because the conclusion was so readily apparent from the evidence and because there was other,. direct evidence that the defendant was driving at the time of the accident, the erroneous admission of the officer's opinion as a lay witness was harmless. *See* Tenn. R.App. P. 36(a); *see also Murphy,* 737 S.W.2d at 533.

A protracted analysis of whether the trial court intended Officer Walker's opinion as lay or expert testimony is unnecessary. Under either analysis, the defendant has failed to show reversible error.

### IV. Cross-examination of Rusty Harpe

 The defendant next contends that the trial court erred by prohibiting him from cross-examining Mr. Harpe "on his

---

4. This court has previously offered the following definition of the term: "Occupant kinetics, as we use the term, is the determination of what happened to the persons (bodies) in

the vehicle during the accident." *State v. William Earl Murphy,* No. 15, slip op. at 7, 1990 WL 40995 (Tenn.Crim.App., Jackson, Apr. 11, 1990).

prior driving under the influence related charges and accidents." The State submits that the trial court did not err by limiting the defendant's cross-examination.

We need not tarry long over the defendant's claim because he failed to make an offer of proof regarding those "driving under the influence related charges and accidents" he claims he was prohibited from utilizing. Defense counsel made several statements to the trial court regarding accidents that Mr. Harpe had been involved in and charges that had begun as DUI and were later reduced to lesser offenses, but she never offered any proof to the trial court to support the assertion that the accidents were alcohol-related or that the prior convictions began as DUI charges. Without this information, it is impossible to conduct a meaningful review of this issue. *See State v. Hall*, 958 S.W.2d 679, 691 n. 10 (Tenn.1997) ("Not only does [an offer of proof] ensure effective and meaningful appellate review, it provides the trial court with the necessary information before an evidentiary ruling is made. Indeed, generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded."); *see also* Tenn. R. Evid. 103. The trial court allowed the defendant to question the witness regarding his previous conviction of DUI and any resultant motive to lie.

The defendant also contends, as part of his argument regarding the limitation of his cross-examination of Mr. Harpe, that the trial court violated his "basic rights essential to a fair trial" when it prohibited him from questioning the witness "about the conditions and implications of [his plea] agreement." The record belies the defendant's argument. Although it is clear from the record that the defendant was unaware of the agreement prior to the trial, the trial court did not, in any way, limit his

questioning of the witness about the agreement. The defendant is not entitled to relief on this issue.

## V. Sufficiency of the Evidence

In his final assignment of error, the defendant asserts that the evidence adduced at trial was insufficient to support his conviction. The State disagrees. We agree with the State.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R.App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn.Crim.App.2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

At the time of the offense in this case, Tennessee Code Annotated section 55–10–401 provided, in pertinent part, "It is unlawful for any person to drive or to be in

physical control of any automobile ... on any of the public roads and highways of the state ... while ... [t]he alcohol concentration in such person's blood or breath is eight-hundredths of one percent (.08 %) or more." T.C.A. § 55–10–401(a)(2) (2003).

The evidence adduced at trial, taken in the light most favorable to the State, established that the defendant and Mr. Harpe began drinking beer together at approximately 5:30 p.m. After drinking for several hours, the two men traveled together in Mr. Harpe's vehicle to the Mouse's Ear, where they consumed even more alcohol. Mr. Harpe testified that they left the Mouse's Ear with the defendant driving. Officer Walker testified that because the defendant's injuries were confined to the left side of his body, he concluded that the defendant had been driving when the car struck the telephone pole.

The defendant admitted being "drunk" at the time of the accident, and testing established that his blood alcohol content was .11 percent. Although the defendant denied driving the car, the jury clearly chose to accredit the testimony of Officer Walker and Mr. Harpe. We decline the defendant's invitation to reassess the credibility of either witness. *See Cabbage,* 571 S.W.2d at 835. The evidence was sufficient to support the defendant's conviction.

*Conclusion*

Based on the foregoing analysis, the judgment of the trial court is affirmed.