# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 17, 2012 Session

## STATE OF TENNESSEE v. MACK BROUSSARD

**Direct Appeal from the Criminal Court for White County**
No. CR3888     David A. Patterson, Judge

No. M2011-01364-CCA-R3-CD - Filed December 17, 2012

A White County Criminal Court Jury convicted the appellant, Mack Broussard, of first degree premeditated murder, and the trial court sentenced him to life imprisonment. On appeal, the appellant contends that the trial court erred by (1) failing to instruct the jury on self-defense; (2) failing to redact the portion of the appellant's statement to police in which he said he was on probation at the time of the crime; and (3) allowing a State witness to give a speculative opinion about the appellant's motive for the killing. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Samuel J. Harris, Cookeville, Tennessee, for the appellant, Mack Broussard.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent W. Cherry, Senior Counsel; Randall A. York, District Attorney General; and Gary McKenzie and Philip A. Hatch, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

At trial, Sergeant Chris Bennett of the Sparta Police Department testified that on April 20, 2009, he went to 33 North Oak Street to perform a welfare check on the victim, Stewart Butler. A foul odor was coming from the house, and no one responded to Sergeant Bennett's knock on the front door. When Sergeant Bennett opened the unlocked door leading into the house from the carport, the smell increased. Sergeant Bennett yelled but got no response.

He went into the living room and found the victim's body lying on the floor.

Detective Travis Barker of the Sparta Police Department testified that after Sergeant Bennett discovered the victim's body, he went to the scene, which was a small, single-story residence. Detective Barker entered the house through the carport, which led into the kitchen. He found a pot of beans on the kitchen stove and an empty bowl beside the pot. Beyond the kitchen was the living room. A small table was between two recliner chairs, one of which was blue. From the amount of blood on the blue recliner, Detective Barker thought the victim had been sitting in the chair when he was injured. The victim's body was lying on the floor in front of the blue recliner, and a blanket from the victim's bedroom was covering the body. Blood was spattered throughout the room, including the wall, ceiling, and floor. Additionally, blood and pieces of the victim's skull had passed through the blinds of the front windows and were stuck to the glass. Detective Barker saw no evidence of a struggle.

Detective Barker testified that the back of the victim's head was almost gone but that he could not discern what had caused the wound. A broken ceramic bowl that had contained beans and onions was under the victim's body. The victim's eyeglasses were underneath the bowl. Detective Barker found a loaded .45 caliber handgun almost completely concealed under the blue recliner. The gun had not been fired recently. Due to the lack of distance between the bottom of the chair and the floor, Detective Barker opined that a person would have had difficulty getting the gun from under the chair. About twelve to eighteen hours after Sergeant Bennett found the victim's body, Detective Barker learned that the victim's Silverado pickup truck had been impounded by a towing service in McMinnville after the driver, the appellant, was arrested for driving under the influence (DUI). Inside the truck, Detective Barker found a claw hammer wrapped in a blood-stained pink towel. Hair, tissue, and blood were on the hammer, leading Detective Barker to believe the hammer could have been the murder weapon.

Officer Brian Holt of the McMinnville Police Department testified that about 8:28 p.m. on April 15, 2009, he arrested the appellant for DUI. Following his arrest, the appellant asked Officer Holt to retrieve his medication, explaining that without it "he could become suicidal or homicidal." Officer Holt did not find any medication in the truck, but he did find eight beers. Officer Holt took the appellant to the Warren County Jail, and the truck was towed. At the jail, the appellant asked if he would be released on bond. When Officer Holt responded negatively, the appellant said that "[it] doesn't matter, I'm f[***]ed anyway."

Dr. Feng Li, the Senior Associate Medical Examiner for Davidson County, testified that the victim was sixty-five years old and weighed 176 pounds. The victim's body was in a "moderate state of decomposition" when Dr. Li performed the autopsy. There were nine

lacerations on the top and back of the victim's head, and the skull was "fractured into pieces." Dr. Li stated that a great amount of force was required to cause the damage to the victim's skull and that the wounds could have been caused by a hammer. He concluded that the victim's death was caused by multiple blunt force injuries to the head. The injuries were consistent with the victim's having been struck from behind by a taller person or having been seated when he was struck. The victim's blood alcohol content was 1.63 milligrams per decimal liter, more than twice the legal limit for driving in this state. However, Dr. Li explained that a body could produce up to 1.00 milligrams of alcohol during decomposition. Therefore, the test result did not necessarily reflect the amount of alcohol the victim ingested before his death. Dr. Li further acknowledged that a barbiturate was in the victim's blood, which would have made him drowsy.

Agent Billy Miller of Tennessee Bureau of Investigation (TBI) testified that he and another agent spoke with the appellant at the Warren County Jail. The appellant was initially willing to speak with them, but then he refused. However, the appellant wanted a business card or some other way to contact the agents if he changed his mind. Before the agents left the jail, the appellant sent word that he wanted to speak with them. The interview began about 11:00 p.m., and the agents advised the appellant of his rights. Agent Miller said the appellant understood his rights and waived them. During the interview, the appellant exposed the white t-shirt he was wearing under his jailhouse uniform and said the reddish-brown stain on the bottom of the t-shirt was the victim's blood. Agent Miller later submitted the t-shirt and the rest of the appellant's clothes to the TBI Crime Laboratory for testing. The appellant told the agents what had happened between him and the victim, and the agents wrote the statement. The appellant reviewed, corrected, and signed the statement.

Agent Miller read the appellant's statement to the jury. In the statement, the appellant claimed as follows: The appellant met the victim's son when they attended Teen Challenge together in Pensacola, Florida. When the appellant finished Teen Challenge, the victim offered him a place to stay in Tennessee. The appellant stated, "I was on probation in Mississippi. I decided to come to Tennessee even though I knew it would violate my probation. I've always been a runner. I knew it would not last long because I always turned myself in." The appellant arrived in Cookeville by bus on April 12, 2009, and the victim picked him up. On April 15, 2009, the victim and the appellant went to visit the victim's mother in a Kingston nursing home. After the visit, the victim stopped at a liquor store and bought some peppermint or spearmint schnapps, which he and the appellant drank on the way back to the victim's house. They also smoked marijuana, and the appellant took some anxiety pills that the victim gave him. When they got to the victim's home, they smoked more marijuana in the victim's shed. At some point, the victim went inside the house to use the telephone. The appellant also went inside and heard the victim on the telephone with someone named Richard. The victim told Richard that "I'll bring him to you," and the

appellant began to think the victim and Richard were "out to get [him]." The victim was sitting in a chair eating. The appellant said that he got a claw hammer, that he hit the victim on the head with it, and that he "killed [the victim] before he killed me." The victim, who was still sitting in the chair, sounded like he was coughing. The appellant got him out of the chair and put him onto the floor. The appellant tried to help the victim, realized it was too late, and covered the victim with a quilt. Then he left in the victim's truck. The appellant stated that he "did not know what [the victim's] motives were towards me" but that he "want[ed] to do the right thing."

Agent Miller testified that the appellant's statement was corroborated in part by a receipt found in a trash can at the victim's residence. The receipt was from a Dollar Tree store in Mississippi. The receipt was dated April 11, 2009, and the appellant's name was printed on it. Agent Miller said the receipt was for the purchase of food items, which may have been for the appellant's bus trip to Tennessee. Agent Miller said that a search of the victim's truck revealed a cooler stocked with beer and food, indicating that the appellant was planning a trip. Agent Miller saw blood spatter on the back and right arm of the blue recliner. The only blood in the seat was in the area that would have been between the legs of someone sitting in the chair, corroborating the appellant's claim that the victim was sitting in the chair when he struck the victim.

Agent Miller testified that during a search of the victim's residence, he noticed that the shed behind the house was locked. All of the victim's tools appeared to be in the shed; no tools were in the house. Agent Miller stated that the appellant did not acknowledge that the hammer came from the tool shed and that nothing at the scene "indicate[d] a kill or be killed scenario." Agent Miller said the appellant maintained that he heard the victim tell someone on the telephone that "I'll bring him to you" and that the appellant thought people were out to get him. Agent Miller thought those statements were significant because the appellant was on probation and his presence in Tennessee was a violation of that probation. Agent Miller said that in his opinion, the victim "was going to turn him in for being in violation of his probation." However, Agent Miller acknowledged that he did not know the identity of Richard and that the appellant never said the victim was going to turn him in for a violation of probation. Agent Miller said that when the appellant heard the victim say that "I'm going to bring him to you," the appellant came to the logical conclusion that the victim was going to turn him in for a probation violation. Agent Miller said he thought the appellant's claim that the appellant believed the victim and Richard were going to kill him was "a self-serving statement."

Agent Mike Turbeville of the TBI Crime Laboratory's Serology/DNA Unit testified as an expert in serology and DNA analysis that he examined swabs taken from the victim's living room ceiling, a known blood sample from the victim, a known DNA swab from the

appellant, the appellant's t-shirt, and the appellant's Nike sneakers. Agent Turbeville explained that because the victim's blood standard was degraded due to decomposition, he was unable to conclusively match samples to the appellant's DNA standard. However, he was able to determine that blood from the victim's ceiling, blood stains on the appellant's t-shirt, and a blood stain on the instep of the appellant's right Nike sneaker were consistent with the victim's blood. The blood from the ceiling, the appellant's t-shirt, and the appellant's sneaker conclusively matched each other. Regarding evidence found in the victim's truck, Agent Turbeville said that the victim's blood was found on the hammer and the towel. Agent Turbeville found a watch underneath the towel, and the victim's blood was on the watch. Agent Turbeville found a gray and white thermal shirt with a camouflage print in the rear passenger area of the truck. The victim's blood was on the shirt. On the front passenger seat of the truck, Agent Turbeville found an atlas with the victim's blood on it. Agent Turbeville said that from his training in blood spatter analysis, "the spatter pattern indicated to me that this atlas was probably in the vicinity of an area where someone was beaten basically."

Dr. James Walker testified for the appellant as an expert in forensic psychology. Dr. Walker reviewed the appellant's medical and legal records and evaluated the appellant on December 8, 2009, and June 11, 2010. The evaluations consisted of interviewing the appellant and administering psychological tests. Dr. Walker said that the appellant had a history of mental illness and hospitalizations in mental health facilities. The appellant's medical records reflected that the appellant had been given psychoactive medications such as Zoloft, an anti-depressant; Rimaron, an anti-depressant; and Depacote, a mood stabilizer. The appellant reported that he was physically and sexually abused as a child, that he was raped as a teenager, and that he was almost raped during a period of incarceration. The appellant dropped out of school in the ninth grade and later obtained his general equivalency diploma (GED). The appellant acknowledged that he did not have a history of gainful employment, noting the longest period he held the same job was six months. Dr. Walker found the appellant competent to stand trial but diagnosed him with depression, post-traumatic stress disorder (PTSD), and polysubstance dependence. Dr. Walker determined that the appellant was malingering and exaggerating his symptoms.

Dr. Walker testified that the appellant relayed to him the events underlying the instant offense. The appellant came to Tennessee on Easter Sunday to stay with the victim and his son, whom he had met in a drug treatment program in Florida. However, because the victim's son was in jail, the victim picked up the appellant at the bus stop. The victim hugged and kissed the appellant, making him feel uncomfortable. From comments the victim made during the ride, the appellant thought the victim wanted a homosexual relationship with him. On the day of the killing, the appellant and the victim were behind the victim's house, smoking marijuana and drinking peppermint schnapps. The victim got a telephone call, told

the appellant it was the victim's sister, and went into the house to talk. Because the victim was gone a long time, the appellant followed him into the house. The appellant heard the victim say "he would bring him to them and they would take care of him." The appellant feared the victim and the other person were conspiring to kidnap and rape him. Afterward, the appellant and the victim took Xanax and Lorazipam. The appellant said the victim tossed a package of Viagra at him and stated, "[W]hat do you think we can do with this[?]" The appellant told Dr. Walker that he was very uncomfortable because he was not sexually interested in the victim. The victim became enraged and told the appellant "about the Ku Klux Klan's activities in this area and how he had better watch it or he would get in trouble with them and he called [the appellant] . . . a n[**]ger loving Jew." The appellant said that the victim grabbed a hammer from near the television and began swinging it while approaching the appellant. The appellant took the hammer from the victim and hit the victim with it several times. The appellant told Dr. Walker, "I didn't want to be molested no more, didn't want to be killed, I didn't have time to think, be mad or nothing." The appellant said he got the keys to the victim's truck and drove away. Shortly thereafter, he was stopped and arrested for DUI.

Dr. Walker testified that the appellant cried profusely as he told his version of the events. Dr. Walker found that the appellant's chronological and detailed recitation of events suggested that the story was credible. The appellant told Dr. Walker that on the day of the killing, he took his prescription medications Depacote, Seraquil, and Haldol, as well as other drugs that were not prescribed to him, namely Xanax and Lorazipam. Dr. Walker said that if the appellant ingested all of the drugs and alcohol he reported, then he would have been extremely intoxicated and could have had difficulty thinking rationally.

On cross-examination, Dr. Walker acknowledged that his opinion would be different if the appellant did not ingest all of the substances he claimed to have taken. He further acknowledged that if the scene reflected no signs of a struggle, it would call into question the appellant's assertion that he was defending himself. Dr. Walker acknowledged that the appellant lied during his interviews. He said the appellant's performance on psychological tests could have indicated an attempt to manipulate the evaluation to benefit his legal proceedings or could have "represented a cry for help."

The jury convicted the appellant of first degree premeditated murder, and the trial court sentenced him to life imprisonment. On appeal, the appellant contends that the trial court erred by (1) failing to instruct the jury on self-defense; (2) failing to redact the portion of the appellant's statement to police in which he said he was on probation at the time of the crime; and (3) allowing a State witness to give a speculative opinion about the appellant's motive for killing the victim. Upon review, we affirm the judgment of the trial court.

## II. Analysis

### A. Jury Instructions

The appellant argues that the trial court erred by failing to instruct the jury on self-defense. Specifically, the appellant contends that his statement to Agent Miller that he killed the victim before the victim could kill him fairly raised the issue of self-defense. The appellant also notes that self-defense was raised in defense counsel's opening statement. The State contends that the proof did not fairly raise the issue of self-defense. We agree with the State.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Therefore, a trial court must instruct the jury on the rules of law applicable to the issues that are fairly raised by the evidence adduced at trial. State v. Townes, 56 S.W.3d 30, 36 (Tenn. Crim. App. 2000). Conversely, there is no duty to charge the jury on an issue not fairly raised by the evidence. Id. "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001). Regardless, if the entire charge fully communicates the applicable law, the trial court does not err in denying an instruction inapplicable to the case at hand. Id.

In this state,

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> > (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> >
> > (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> >
> > (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2)(A)-(C). Whether a defendant acted in self-defense is a factual question to be determined by a jury. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). As such, "in the context of judicial review of the jury verdict, in order to prevail, the [appellant] must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

The appellant told police that he overheard the victim talking on the telephone with Richard and that the victim said he would bring the appellant to Richard. The appellant claimed that he thought the victim's statement to Richard meant that the victim and Richard were going to kill him. However, there was no discernable threat in the victim's statement. Moreover, nothing indicates that the appellant was in imminent danger of death or serious bodily injury when he killed the victim. According to the appellant's statement to police, the victim was sitting in his recliner and eating when the appellant attacked him with the hammer. The physical evidence supports the appellant's statement. Therefore, we agree with the trial court that the proof did not raise a self-defense claim in this case.

## B. Prior Criminal Record

The appellant contends that the trial court erred by failing to grant his motion to redact the portion of his statement in which he referred to being on probation at the time of the crime. The State argues that the appellant waived the issue by failing to request a jury-out hearing to prohibit the evidence pursuant to Tennessee Rule of Evidence 404(b). In any event, the State maintains that the appellant's probationary status was relevant to prove motive. We conclude that the appellant is not entitled to relief.

Before trial, defense counsel filed a motion to suppress his statement to police, claiming that the statement was involuntary. However, the trial court overruled the motion. On the day of trial, after the jury was selected, defense counsel made a motion in limine to prohibit the State from mentioning in its opening statement that the appellant was on probation in Mississippi when he arrived in Tennessee. The State argued that the appellant's probationary status was relevant to show his motive for the crime. The State explained,

> Clearly the fact that the victim is on the phone saying I'll bring
> [him to you], which is an indication of turning him in to law
> enforcement, that the victim was killed sitting in the chair with
> blows to the back of the head, that the vehicle was then taken
> and the [appellant] did exactly what he said in his statement, he
> ran, the fact that he has motive to run because of probation
> would, is at the heart of the type of evidence that is allowed

under 404(b).

Defense counsel maintained that nothing indicated Richard was a law enforcement officer or a probation officer. Moreover, the appellant told police that he thought the victim was plotting to kill him, not that the victim was plotting to turn him in for a probation violation. Defense counsel acknowledged that the State was not trying to show that the appellant was acting in conformity with his prior acts. However, defense counsel argued that evidence of the appellant's prior criminal history would be highly prejudicial.

The trial court agreed with the State but ordered the State not to mention the appellant's probation violation in its opening statement because that proof was not yet in the record. The court said that it had not heard a motion about redacting the statement; therefore, the entire statement was going to be admitted. At that point, defense counsel said that his next motion dealt with redacting the portion of the appellant's statement to police in which he said he came to Tennessee even though he knew it would be a violation of his probation.

The trial court admonished defense counsel for asking for "[a]n eleventh hour redaction," stating that the motion should have been made earlier. Defense counsel explained that he sought redaction because it revealed a prior conviction. The State argued that the appellant's statement that he was violating probation "cuts right to why he did what he did." The trial court denied defense counsel's motion.

Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404 provides,

> (b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

-9-

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005), State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character.

The State claims that the appellant's probation violation was relevant to show his motive for killing the victim, not to prove the appellant's action in conformity with a character trait. Given the State's theory of the case, that the appellant killed the victim because he thought the victim was going to turn him in for a probation violation, we agree that the evidence was relevant to show the appellant's motive. Moreover, the appellant suffered little prejudice because the State did not present any evidence regarding the crime(s) for which the appellant was on probation. Therefore, we conclude that the trial court did not err in failing to redact the appellant's statement.

## C. Motive

Finally, the appellant argues that the trial court erred by allowing Agent Miller to testify that he believed the appellant killed the victim in order to avoid being turned in for violating his probation. The appellant contends that Agent Miller's opinion did not meet the requirements of Rule 701, Tennessee Rules of Evidence, for the admission of a lay opinion. The appellant says that Agent Miller's opinion was "pure conjecture" because "[t]here is not a single piece of evidence that supports this speculative opinion that allows the State to emphasize a criminal nature in the [appellant] as being the basis for committing the crime." The State acknowledges that Agent Miller's "testimony was speculative and not grounded upon an adequate factual basis and the trial judge should not have allowed it into evidence." However, the State contends that the trial court's error in admitting the testimony was harmless. We agree with the State that the error was harmless.

Tennessee Rule of Evidence 701 provides,

> If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
>
> > (1) rationally based on the perception of the witness and
> >
> > (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

This court will review a challenge to the admission of lay opinion testimony under an abuse of discretion standard. State v. McCloud, 310 S.W.3d 851, 865 (Tenn. Crim. App. 2009).

Turning to the instant case, the appellant said in his statement that he was violating his probation by being in Tennessee and that the victim planned to take him to Richard. However, the appellant did not specifically say in the statement that the victim was going to turn him in for violating his probation. It is the jury's responsibility to draw conclusions from the evidence adduced at trial; therefore, a "non-expert witness must ordinarily confine his testimony to a narration of facts based on first-hand knowledge and avoid stating mere personal opinions." State v. Middlebrooks, 840 S.W.2d 317, 330 (Tenn. 1992). Generally, non-expert witnesses are excluded from testifying regarding "'their conclusions or opinions regarding the facts in issue'" in order to preserve the jury's fact-finding role. Blackburn v. Murphy, 737 S.W.2d 529, 533 (Tenn. 1987) (quoting Wilson v. Nashville, Chattanooga &

St. Louis Railway, 65 S.W.2d 637, 643 (Tenn. 1933)). In other words, "'[i]t is the function of the witness to state evidentiary facts and the function of the jury to draw such conclusions as the facts warrant.'" Id. (quoting Wilson, 65 S.W.2d at 643). Therefore, we agree with the appellant and the State that the trial court erred by allowing Agent Miller to testify regarding the appellant's motive for killing the victim. See State v. Vernon Motley, No. W2010-01989-CCA-R3-CD, 2012 Tenn. Crim. App. LEXIS 202, at *24 (Jackson, Mar. 29, 2012), perm. to appeal denied, (Tenn. 2012).

Next, we must determine the effect of the error. Our supreme court has explained that no conviction should be reversed on appeal "'except for errors which affirmatively appear to have affected the result of the trial on its merits.'" State v. Dotson, 254 S.W.3d 378, 388 (Tenn. 2008) (quoting Tenn. R. Crim. P. 52(a)); see also Tenn. R. App. P. 36(b). When determining the effect of an error, "considering the whole record, "'[t]he more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome on its merits.'" Dotson, 245 S.W.3d at 388 (quoting State v. Toliver, 117 S.W.3d 216, 231 (Tenn. 2003)). In other words, "[t]he key question is whether the error likely had an injurious effect on the jury's decision-making process. If the answer is yes, the error cannot be harmless." Id. at 389.

The appellant never disputed that he killed the victim but claimed that he killed the victim in self-defense. The appellant's statement to police, combined with the physical proof at the crime scene, belied this contention. The appellant admitted that the victim was sitting and eating when he struck the victim with the hammer. The medical examiner found that the appellant struck the victim nine times in the back of the head and used extreme force. Police officers testified that the blood on the blue recliner supported the appellant's statement that he killed the victim while the victim was sitting and eating. Therefore, it is highly unlikely that Agent Miller's opinion regarding the appellant's motive for the killing affirmatively affected the jury's decision. Accordingly, we agree with the State that the trial court's error in admitting Agent Miller's opinion was harmless.

### III. Conclusion

We conclude that the trial court did not err by refusing to instruct the jury on self-defense or by refusing to redact the appellant's statement to police. Although the trial court erred by allowing Agent Miller to give his opinion about the appellant's motive, the error was harmless. Accordingly, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-12-